Augustine ANDREWS, Sr.,
Plaintiff, Appellant,

v.

BECHTEL POWER CORPORATION and
Local 276, Plumbers and Pipefitters
Union, Defendants, Appellees.

No. 84–1913.

United States Court of Appeals,
First Circuit.

Argued Sept. 6, 1985.
Decided Dec. 19, 1985.

Walter R. Stone, with whom Sharon O'Keefe, and Edward L. Gerstein, Providence, R.I., were on brief, for appellant.

David M. Pellow with whom John J. Dee and Bond, Schoeneck & King, Syracuse, N.Y., were on brief for appellee Bechtel Power Corp.

James A. Toomey with whom Barbara J. Saint Andre and Murphy, Lamere & Murphy, Braintree, Mass., were on brief for appellee Local 276, Plumbers and Pipefitters Union.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and CEREZO,* District Judge.

BOWNES, Circuit Judge.

Plaintiff-appellant Augustine Andrews appeals a judgment for defendants-appellees Bechtel Power Corporation and Local 276, Plumbers and Pipefitters Union, in a Title VII employment discrimination case arising out of incidents which took place in 1969. Andrews, who was represented by counsel from the initial filing of the suit in 1973 to just before the case went to trial in 1982, handled the trial *pro se.* In addition to claiming that the district court erred by finding for the defendants, Andrews also claims that the district court erred because it denied class certification, it permitted him to proceed *pro se,* it restricted evidence of classwide discrimination, and it denied his motion to amend the complaint at the eve of the trial.

## I. FACTS

The claimed discrimination arose when Andrews, who is black, attempted to get a job as a pipewelder at the Pilgrim I nuclear power plant being built by Bechtel. Bechtel was a party to a nationwide collective bargaining agreement which required it to procure pipewelders through local union hiring halls. Sometime during March or April of 1969, Andrews went to Local 276 and told its business manager, John Lee, that he wanted to be referred to the Pilgrim I site for employment as a pipewelder. Lee had him fill out a card with his name and address and told him that he would be referred to the site when his name came

---

* Of the District of Puerto Rico, sitting by designation.

up. Lee testified that he kept the employment cards in order of application and that after the Union welders had been referred he made referrals from the employment cards in the chronological order of application. Andrews testified that, after finding out from Lee that there were no black members of Local 276, he asked Lee if he could become a member. He claims Lee responded that "the roads are full." Andrews also claims that he immediately filed a complaint with the Massachusetts Commission Against Discrimination (MCAD). He returned to the Union hall and was told that he would be referred when the local membership was exhausted. He then filed a second complaint with MCAD on June 3, 1969. The district court found no evidence of any formal complaint to MCAD before June 3. Sometime after the June 3 complaint, MCAD suggested to the Union that Andrews be given an immediate referral to Pilgrim I; the Union, however, refused to refer Andrews ahead of individuals who had applied earlier than he did. On July 22, 1969, Andrews received a referral to the Pilgrim I job site from Local 276 and reported there for work.

The Atomic Energy Commission, which regulated the construction of nuclear power plants, required that all piping be done by welders who had qualified by successfully completing a test weld under the Boiler and Pressure Vessel Code of the American Society of Mechanical Engineers (the ASME Code). Andrews had been a welder at the Fore River Shipyard in Quincy, Massachusetts, for nineteen years and had been a highly successful nuclear pipe welder for nuclear submarines at the shipyard from 1965–67, but had not worked as a welder for two years preceding his referral to Bechtel. He had previously qualified under the Navy's welding code, but had never been tested under the ASME Code. The ASME test required that the pipes be welded using an open butt procedure. At the shipyard, where plaintiff had worked, most welding was done using a backing ring or consumable insert. Welding an open butt joint is more difficult than welding a joint using a backing ring or insert.

The welding test was administered by Jack Drust. Andrews twice requested that Drust make available to him the written procedure for the weld, a step-by-step guide to how the weld was to be done established by the ASME. Drust denied this request and gave Andrews oral instructions on how to make the weld. The first step in the test required the welder to "tack" the pipe, getting it ready for the actual welding. Next, the welder had to complete a "root pass" using specified material. A "root pass" is an initial layer of welding material joining the pipes. If the root pass was found visually acceptable at this stage, meaning that the heat had appropriately penetrated the material and there were no crevices on the inside of the weld, the welder would be permitted to finish the weld, which then would be tested for strength using a guided bend test. After Andrews completed the root pass on his test pipe, Drust inspected it and found it visually unacceptable. Andrews asked to be allowed to complete the weld and have it undergo the guided bend test, but Drust denied the request. Drust also refused to let Andrews take an immediate retest. While Bechtel did permit welders to take the test again after practicing for a few weeks and obtaining a new referral from the Union, Andrews never contacted either Bechtel to request a retest or the Union to request a second referral.

After Andrews had failed the test and was terminated by Bechtel, MCAD issued a final disposition on his complaint, indicating that Bechtel had agreed to retest Andrews after some weeks of training. MCAD then referred Andrews to the EEOC and he filed a complaint with it in the fall of 1969. The EEOC completed its investigation in 1971 and found that, while there was probable cause to believe that Bechtel and Local 276 did discriminate against blacks, there was no probable cause to believe that Andrews as an individual had been discriminated against. The EEOC, Bechtel and Local 276 entered into a conciliation agreement and Andrews was issued a Right to Sue Notice on August 14, 1973.

## II. THE DENIAL OF CLASS CERTIFI-CATION

On November 9, 1973, Andrews filed a complaint in United States District Court for the District of Massachusetts charging that the Union and Bechtel had engaged in discriminatory hiring practices against himself and all other black persons similarly situated in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the fourteenth amendment and 42 U.S.C. § 1981, and seeking injunctive and monetary relief. At this time, Andrews was represented by Morris Shubow. Local 276 answered in December of 1973 and Bechtel answered in February of 1974. The case then lay dormant for the next three years until Andrews filed interrogatories in February of 1977. After some months of dispute about the scope of discovery, the case was assigned to Judge Aldrich, sitting in the district court. Andrews had moved to be certified as a class representative on behalf of

> all past, present, and future actual and potential black applicants and employees in manual job classifications for Bechtel Corporation ... at the Pilgrim Power Station Project(s) in Plymouth, Massachusetts or at any other alternative site within the jurisdiction of this Court who have been denied equal employment opportunities on account of their race.

Judge Aldrich held a preliminary hearing in December of 1977 at which Andrews was represented by Elizabeth Rodgers, a new member of Morris Shubow's law firm. At this hearing, Judge Aldrich expressed great concern about the adequacy of Andrews' counsel to represent the class given the enormous delay between the filing of the suit in 1973 and the commencement of pretrial work in 1977 and ordered Morris Shubow to submit an explanation for this delay. Shubow told the court that he had filed the complaint for Andrews after representing him *pro bono* before the EEOC, knowing that he would not be able to handle the case due to an already overloaded practice. He, therefore, attempted to interest other attorneys in the case with no success. He then began a process of expanding his firm in order to be able to handle the case. In 1976, the firm hired a law student who drafted the interrogatories. It then hired Elizabeth Rodgers who, although just out of law school, had quite a bit of experience with Title VII litigation. As soon as Rodgers was admitted to the bar, she filed the interrogatories.

In addition to his concern about the adequacy of counsel to prosecute a class action, Judge Aldrich also expressed concern about the broad scope of the class requested, which would include workers from unions other than Local 276, and ordered the parties to file briefs on the class certification issue. In a memorandum and order dated March 24, 1978, Judge Aldrich determined that, although counsel would be inadequate to represent the broad class of black manual laborers, due to the delay and the failure to join the other craft unions, adequate representation of a narrower class would be possible. He proposed a class consisting of "actual black applicants for referral by the Union, or once referred, applicants for employment by Bechtel, at the Pilgrim I project as nuclear welders, and black employees there who were potential applicants for transfer from day laborer to nuclear welder." While finding that as to this class Andrews' claim was typical and that there were questions of law and fact common to the class, Judge Aldrich stated that there was no showing of numerosity such that joinder would be impracticable and ordered discovery limited to that issue.

Sometime during 1979, the case was reassigned to Judge Mazzone. On April 22, 1980, Judge Mazzone issued a memorandum and order denying class certification because of a failure to satisfy the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1).

■ Andrews first argues that Judge Mazzone erred by failing to reassess and broaden the class earlier limited by Judge Aldrich. Andrews next contends that Judge Mazzone erred in finding that the limited class failed to meet the numerosity

requirement of Federal Rule of Civil Procedure 23(a)(1). District courts have broad discretion concerning issues of class certification. *Califano v. Yamasaki*, 442 U.S. 682, 703, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979); *Dionne v. Bouley*, 757 F.2d 1344, 1355 (1st Cir.1985). Unless the district court operated under an erroneous rule of law, we will not reverse a grant or denial of class certification except for "abuse of discretion." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100–01, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981); *DeGrace v. Rumsfeld*, 614 F.2d 796, 809 n. 12 (1st Cir.1980).

We note first that Andrews has claimed that Judge Mazzone's order was actually a decertification order because Judge Aldrich had conditionally certified the class prior to ordering discovery on the issue of numerosity. Our reading of Judge Aldrich's order, however, reveals no order of conditional certification. What he said was: "Upon completion [of discovery], an order will, or will not then be entered for such certification." In any event, the entering of a conditional certification order does not in any way impinge upon the discretion of the court to later alter or rescind the order. *Walker v. Robbins Hose Fire Co. No. 1, Inc.*, 76 F.R.D. 218, 220 (D.Del.1977).

## A. *Judge Aldrich's Limitation of Class*

Andrews moved to have Judge Aldrich certify the following class:

> all past, present and future actual and potential black applicants and employees in manual job classifications for Bechtel Corporation or Bechtel Power Corporation at the Pilgrim Power Station Project(s) in Plymouth, Massachusetts or at any other alternative site within the jurisdiction of this Court, who have been denied equal employment opportunities on account of their race.

In his order, Judge Aldrich described a more limited class:

> actual black applicants for referral by the Union, or, once referred, applicants for employment by Bechtel, at the Pilgrim I project as nuclear welders, and black employees there who were potential applicants for transfer from day laborer to nuclear welder.

The limited class description is closer to Andrews' original class description in his complaint, a class of persons similarly situated to Andrews.

Rule 23(a) states: "One or more members of a class may sue or be sued as representative parties on behalf of all only if ... (4) the representative parties will fairly and adequately protect the interests of the class." The rule has two parts. The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation. *Weiss v. York Hospital*, 745 F.2d 786, 811 (3d Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *M. Berenson Co., Inc. v. Faneuil Hall Marketplace*, 100 F.R.D. 468, 470 (D.Mass.1984). Adequate representation is particularly important because of the *res judicata* implications of a class judgment. If the case is not properly and vigorously conducted, either plaintiffs or defendants or both will suffer the consequences of being bound by the resulting judgment. *Kemp v. Birmingham News Co.*, 608 F.2d 1049 (5th Cir.1979); *Ferraro v. General Motors Corp.*, 105 F.R.D. 429, 431 (D.N.J.1985).

Judge Aldrich's limitation of the scope of Andrews' plaintiff class from potential and future applicants to actual applicants and from all manual laborer classifications to that of nuclear welder was based upon the following findings: that Andrews was an inadequate representative of the broad class, that the inexcusably long delay in the prosecution of plaintiffs' case demonstrated Andrews' and his counsel's indifference to protecting the interests of parties whom he claimed to represent, *see Guerine v. J. & W. Investment, Inc.*, 544 F.2d 863, 865 (5th Cir.1977); that for those plaintiffs who might have a claim against unions other

than Local 276, it was too late to join the other unions as defendants; and that Andrews would have difficulty establishing proof of discriminatory actions claimed on behalf of the broad class after such a long passage of time.

■ In addition, the judge found that the long delay in prosecution of plaintiffs' case was prejudicial to the defendants and a violation of the intent of Rule 23(c)(1). Rule 23(c)(1) states: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." One purpose of the rule is to protect the defendants from prejudice caused by a late expansion of the class. *McCarthy v. Kleindienst,* 741 F.2d 1406, 1411–12 (D.C.Cir.1984). Andrews' delay made the defendants' task of collecting and producing evidence related to the broad class more difficult and thereby prejudiced the defendants' case. These considerations led Judge Aldrich to find Andrews an inadequate representative for the broad class.

■ Despite these problems, which were grounds for denial of certification entirely, Judge Aldrich carved out a class which Andrews could adequately represent if it could meet the numerosity requirement of 23(a)(1). We do not find that Judge Aldrich abused his discretion in so limiting the class. Because Judge Aldrich's order was proper, we also find that Judge Mazzone did not abuse his discretion by not reassessing the breadth of the class.

## B. *Judge Mazzone's Denial of Certification*

Judge Mazzone denied class certification to the limited class described by Judge Aldrich because Andrews failed to meet the numerosity requirement of Rule 23(a)(1). The rule states: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable." Judge Mazzone found that the information Andrews provided concerning class members indicated two subclasses. The first subclass consisted of black applicants for referral by the Union who actually applied but were never referred to Bechtel by the Union for discriminatory reasons. Fourteen persons requested referral and all but three were referred. Subclass one, therefore, consisted of three persons and the judge held that "a class this size is patently unworthy of certification."

Subclass two, the Bechtel subclass, consisted of the same applicants who were denied referral by the Union because Bechtel accepted this referral hiring practice (3), blacks who were not hired after referral (7), and potential applicants from day laborer jobs to nuclear welder (39). The Bechtel subclass had a maximum total of forty-nine persons, most of whom lived in the same general area of southeastern Massachusetts. The judge noted that Andrews identified only one day laborer who evoked an interest in transferring from day laborer to nuclear welder and stated that the lack of interest indicated there was little need for a class action suit. Based on the practicality of joinder of the members of the Bechtel subclass, Judge Mazzone denied class certification.

■ Again, our standard of review is "abuse of discretion," *Dionne v. Bouley,* 757 F.2d 1344, 1355 (1st Cir.1985). Despite the broad remedial purpose of Title VII actions, class actions proposed under Title VII must be held to the requirements of Rule 23. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). The facts and circumstances of each case are to be taken into account to determine numerosity under 23(a)(1). *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); *Kelley v. Norfolk & Western Railway Co.* 584 F.2d 34, 35 (4th Cir.1978). While numbers alone are not usually determinative, a very small class may not meet the numerosity requirement because joinder of all members is practicable, *Gilchrist v. Bolger,* 733 F.2d 1551, 1555 (11th Cir.1984). Joinder is considered

more practicable when all members of the class are from the same geographic area, *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981); *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 53 F.R.D. 531, 534 (D.N.H.1971). In addition, where class members can be easily identified, joinder is more likely to be practicable. *Garcia v. Gloor*, 618 F.2d at 267.

 The first subclass consisting of three members is clearly not sufficiently numerous to make joinder impracticable. Although the Bechtel subclass had a maximum number of forty-nine members, numbers alone do not determine numerosity. Judge Mazzone correctly noted that the members of the subclass came from the same small geographic area—all living in southeastern Massachusetts—and, therefore, could join or be joined in a suit of named parties. Judge Mazzone properly found that the class did not satisfy Rule 23(a)(1). We find that he did not abuse his discretion in denying Andrews' motion for class certification.

## III. ALLOWING ANDREWS TO PROCEED *PRO SE*

Andrews initially was represented by Morris Shubow. Shubow had represented Andrews *pro bono* during the EEOC proceedings and filed the complaint for him after the EEOC issued a Right to Sue Notice. At the time, he was the sole associate in a two-person partnership. He knew that he would not be able to prosecute the suit without assistance and made some unsuccessful attempts to interest other attorneys in the suit. When the partnership dissolved, leaving only Morris Shubow and another attorney, the decision was made to expand the firm to the point where it could handle the case itself. Two new attorneys were hired, but this still failed to create the time to pursue the Andrews case. In 1976, the firm was renamed Shubow, Stahlin & Bergstresser, and it was decided to hire someone with a specific background and interest in employment discrimination. Elizabeth Rodgers was hired in September of 1976 and as soon as she was admitted to the bar, she began to pursue the case.

Rodgers, along with another new lawyer in the firm, Ann Gilmore, represented Andrews before Judge Aldrich. During this period, Andrews entered an appearance *pro se* and filed some of his own motions and briefs along with those filed by his counsel. In late 1978, while the case was still before Judge Aldrich, Gilmore moved to withdraw her appearance and John Rose, a Connecticut attorney and friend of the Andrews family, filed an appearance for Andrews and attempted to assist with the case. On May 18, 1979, he filed a motion to withdraw his appearance, "it appearing that the Plaintiff is not disposed to cooperate with counsel or to accept his advice concerning the procedure to be followed to attempt to resolve the issues in the case." This motion was granted in June of 1979. In October of 1979, Andrews wrote to Judge Mazzone, who had been reassigned the case, and asked that he be allowed to address the court because he believed that his attorneys, Rose and Rodgers, were involved in a conspiracy directed against him and the class members to keep the class from being certified. In November of 1979, Rodgers moved to withdraw her appearance, stating that Andrews had requested that she cease representing him and that she believed the relationship of trust had "irretrievably broken down."

A hearing on this motion was held on January 14, 1980. At the hearing, Rodgers indicated that she and Rose had felt that they would not be able to satisfy the numerosity requirement and had advised Andrews to settle. This had resulted in Andrews believing that they were conspiring against the class certification. They had requested a hearing on the matter in the spring of 1979, which was never scheduled, and during this period Rodgers became heavily involved in other litigation. The long delay only strengthened Andrews' conviction that she was trying to sabotage his case. In the meantime, Rodgers contacted other attorneys and attempted to get them to take the case, but with no

success. At the hearing, Andrews told the court that if the court felt Rodgers was qualified to represent him, he would agree to her representation. Judge Mazzone then told Andrews that he should not continue to retain Rodgers unless he was sure that he was satisfied with her representation, but that he would make a decision on the class certification issue first and that Andrews could decide after that about representation.

On April 22, 1980, Judge Mazzone issued a memorandum and order denying class certification because of a failure to satisfy the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1). In the memorandum, Judge Mazzone stated that he would not permit Rodgers to withdraw from the case because

> the plaintiff's need for assistance in prosecuting a potentially complex case requiring substantive factual development is acute. Having assumed the obligation to vigilantly represent the plaintiff, counsel's firm, after seven years of association with the plaintiff, cannot be permitted to abandon the case at this time when trial is imminent.

On September 8, 1980, Rodgers again moved to withdraw her appearance because she had left Morris Shubow's firm and he was the counsel of record. This motion was denied, but without prejudice to renew if Shubow assured the court that he would be prepared to go forward with the trial. On November 7, Rodgers renewed her motion to withdraw. At the same time, the law firm of Stahlin and Bergstresser, Inc., previously Shubow, Stahlin and Bergstresser, Inc., wrote the court to inform it that Shubow had left the firm to go into a solo practice and that none of the remaining attorneys in the firm had ever represented Andrews or had any experience with employment discrimination cases. Although there is no record of whether Shubow informed the court that he was prepared to take the case to trial, both Rodgers and the firm of Stahlin and Bergstresser were permitted to withdraw from the case. Judge Mazzone then scheduled the case for trial on December 9, 1980. On November 14,

1980, Fredrick Golder filed an appearance as co-counsel for Andrews. On December 5, 1980, Judge Mazzone disqualified himself due to a conflict with one of the law firms representing Bechtel. The case was then reassigned to Judge Nelson.

On December 29, 1980, Judge Nelson held a status conference at which he directed the parties to discuss the possibilities of settlement and report back to the court by February 9, 1981. No agreement was able to be reached. Thereafter, nothing much appears to have happened with the case until July 20, 1981, when Fredrick Golder filed a notice of withdrawal of appearance for Andrews. The reason for this withdrawal cannot be discerned from the record.

On August 31, 1981, Judge Nelson in a written memorandum granted defendants' motions for partial summary judgment on the fourteenth amendment and § 1981 claims on the ground that they were time barred. On September 29, 1981, Andrews, acting *pro se*, filed a notice of appeal of Judge Nelson's decision to dismiss the § 1981 claim because it was time barred. This appeal was dismissed as premature. On December 2, 1981, a second *pro se* notice of appeal filed on September 30, but not properly processed at the time, was docketed. This appeal was dismissed on December 29.

On February 4, 1982, Judge Nelson held a pretrial conference and scheduled trial for May 3, 1982. Andrews was present at this conference; however, it is not clear whether his counsel, Morris Shubow, was present. Andrews indicated to Judge Nelson that he wished to appear both by counsel and *pro se*. Judge Nelson told him that he would have to make a choice and advised him that he would be better off with the assistance of counsel. At this time, Andrews agreed to Shubow's continued representation.

On February 10, 1982, Andrews filed *pro se* demands for compensation from Bechtel and Local 276 asking for twelve years worth of back wages amounting to $864,-

432.20 and $15,000,000.00 in punitive damages. On February 16, 1982, Shubow moved for leave to withdraw, apparently at Andrews' request. Judge Nelson granted Shubow's motion on February 19, 1982. Also on that same day, Andrews filed a motion to recuse Judge Nelson from the case for conspiring with Shubow in violation of the fourteenth amendment and § 1981, for not permitting Andrews and other members of the public into his chambers during the pretrial conference held on December 29, 1980, and for not permitting a news reporter into the February 4, 1982 pretrial conference. This motion was denied by Judge Nelson on February 23, 1982. On April 1, 1982, Andrews, *pro se,* moved that his petition for relief from Judge Nelson's orders be heard by a district court panel of three judges. This motion was denied by Judge Nelson on April 7, 1982. On April 19, 1982, Andrews, *pro se,* moved to have Judge Nelson disqualified because of a conflict of interest. This motion was denied on April 23, 1982.

On April 27, 1982, Andrews, *pro se,* filed a request for legal assistance. This request was objected to by Bechtel on the following grounds: the request was untimely, coming as it did only seven days before trial was scheduled to begin; Andrews was not entitled to the provision of such assistance since he had been unable to retain five previous counsel because of his refusal to accept legal advice; appointment of new counsel would only lead to further delays in a trial already delayed nine years and such further delays would be prejudicial and costly to Bechtel. On May 3, 1982, a conference on the issue of representation was held and Judge Nelson emphasized to Andrews the importance of being represented by trained counsel. Andrews agreed to proceed with counsel if he could find someone who would represent him to his satisfaction. Judge Nelson gave Andrews the names of two attorneys, one of whom was Walter Prince, a former Assistant United States Attorney. Prince was black and had had experience in the area of employment discrimination. Prince apparently indicated that he would be willing to

represent Andrews; Andrews decided, however, that he did not want him. A final pretrial conference was held on May 18, 1982, during which Judge Nelson reviewed with Andrews his decision to proceed *pro se.* At the conference Andrews said, "I'm finding that I don't consider that I would find anybody any better than Mr. Prince in my category, because I believe he's qualified to do it. But the way this case has been going on for thirteen years, it doesn't matter what attorney comes." At the end of this conference, Judge Nelson concluded:

> In light of this conference, in light of all the effort and time that I put into trying to steer you to get a lawyer, I can't give any more time to that. That issue is over. We will go ahead with what you have.
>
> THE PLAINTIFF: Okay.
>
> THE COURT: So I'm not going to get involved with trying to get you a lawyer or giving a lawyer time to prepare your case.

Trial commenced on July 26, 1982. On July 28, 1982, at the end of the third day of trial, after securing agreement from both sides, Judge Nelson suggested that Andrews should consider very seriously the idea of settling the case. He then offered to appoint Harry Daniels of Hale and Dorr to represent Andrews in settlement negotiations if Daniels was acceptable to Andrews. Over the next month, Andrews met with Daniels and told the court on August 23, 1982, that he was not satisfied with what Daniels came up with and that he would prefer to go ahead with the trial. Judge Nelson then reiterated to Andrews that he thought it was unwise to proceed *pro se* and that he had a standing offer from the court for assistance in obtaining counsel, including a list of people available for consultation, negotiation or representation at trial. Trial then continued through the next day.

On September 22, 1982, there appears to have been a conference, although it is not recorded on the docket sheet, during which the parties agreed to a long recess to con-

sider once again the possibility of settlement. Andrews agreed to be assisted in this endeavor by Harry Daniels. As before, attempts at settlement failed and trial resumed on June 14, 1983, with Andrews proceeding *pro se*, and continued for the next three days. After four days of trial in September of 1983, the trial ended. After the trial, Judge Nelson gave Andrews whatever time he needed to submit post-trial memoranda.

Andrews now makes the following claims of error. He first argues that the district court should not have allowed Morris Shubow to withdraw from the case, even though Andrews asked Shubow to withdraw. He suggests that the reason Andrews asked Shubow to withdraw was because he knew that Shubow did not really know anything about the case, having never done any of the actual work on it, and that Shubow had in the past been willing to let the case slide. Andrews now suggests that before permitting Shubow to withdraw Judge Nelson should have been required to make a finding that the conflict between Shubow and Andrews would have been more harmful to proper presentation of Andrews' case than allowing Andrews to proceed *pro se*. Andrews also argues that Judge Nelson should have appointed counsel to try the case as he requested. While Andrews admits that Judge Nelson *offered* to provide counsel for him, it is his contention that this was primarily for the purpose of settlement and that Judge Nelson would not have allowed another attorney to take the case to trial if it would have led to any delay of the trial. Finally, Andrews argues that the failure to appoint counsel was prejudicial to his case both because Andrews was unable to present his best case and because Judge Nelson's frustration with Andrews as a *pro se* plaintiff during the course of the trial made it impossible for him to be an impartial fact finder.

 We consider first Andrews' claim that Shubow should not have been permitted to withdraw. "The grant or denial of an attorney's motion to withdraw in a civil case is a matter addressed to the discretion of the trial court and will be reversed on appeal only when the trial court has abused its discretion." *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1087 (7th Cir.1982). We cannot find any abuse of discretion here. Although Andrews may have had good reason to be dissatisfied with Shubow's prior representation and to doubt his commitment to the case, nonetheless, it was Andrews who decided that Shubow should cease representing him. Andrews had made it quite clear at the February 4, 1982 conference that he wished to be able to proceed *pro se* and had only reluctantly agreed to continue having Shubow represent him. Four days later, he wrote Shubow and told him that he was discharged. "There is no requirement of law or common sense that a court compel counsel to continue to represent a former client when there has been a termination of the attorney client relationship before trial by mutual consent ...." *McDonnell v. Tabah*, 297 F.2d 731, 733 (2d Cir.1961). *See also Washington v. Sherwin Real Estate, Inc.*, 694 F.2d at 1088; *Fluhr v. Roberts*, 463 F.Supp. 745, 747 (W.D.Ky.1979); *Potts v. Mitchell*, 410 F.Supp. 1278, 1281 (W.D.N.C.1976). The district court had good reason to believe that Andrews was dead set against having Shubow represent him and that coercing the two parties into continuing this relationship would be neither justifiable nor beneficial. One can imagine that Andrews, in particular, might have felt a considerable loss of personal autonomy at being forced to proceed with counsel in whom he had no confidence, even though in hindsight he may realize that Shubow's representation would have been better than proceeding *pro se*.

We next turn to the claim that Judge Nelson should have appointed counsel for Andrews rather than let him proceed *pro se*. Two preliminary matters should be addressed first. Andrews has contended that while Judge Nelson offered to appoint counsel, it was only for the purpose of settlement. Our review of the record does not bear this out. Only one attorney was appointed for the purpose of settlement negotiations and that was Harry Daniels of

Hale and Dorr. It appears from the record that the two attorneys referred to Andrews on May 3, 1982, Prince and Hensley, were referred for the purpose of trying the case, although Judge Nelson may also have recommended to Andrews that he think again about settling.

Second, the record does not show that Judge Nelson refused to allow a new attorney on the case if it would require a delay of the trial date. At the May 18, 1982 conference, during which the possibility of having Attorney Prince represent Andrews was discussed, Andrews made it clear that it was *his* decision not to work with Prince, as the following colloquy demonstrates:

THE COURT: ... My understanding is that you spoke to him at great length and both of you appeared before me, and there was some indication that he would represent you and you would accept his representation, provided, however, that you satisfied other problems that you were having with him. Is that fair?

THE PLAINTIFF: Well, no. I never really told him that he could represent me, and gave him no indication, until after he asked to look at some more papers before we would make an agreement.

THE COURT: Okay. That's fair. In any event, after all of that you have since spoken with him and he's since done some research and you have decided that you do not want him. Right?

THE PLAINTIFF: Yes.

. . . .

THE COURT: ... However, you have told me over and over again this day, and now again on the record, that you feel that you can make the presentation that you wish, that you can make it in conformity with and agreement with the law and my rulings, and that you would prefer to continue just going ahead and getting it over with.

PLAINTIFF: Yes, your Honor.

Rather than it being the case that it was the judge who was unwilling to tolerate any further delay, it appears that it was Andrews who did not want to wait any longer. This is also borne out by a colloquy between Andrews and Judge Nelson which took place during the trial.

THE COURT: Are you suggesting that there is no lawyer who would take your case?

MR. ANDREWS: Yes. No lawyer that would bring it to trial, no lawyer would bring it to trial.

THE COURT: The Court referred you, at your request, two lawyers to talk the case over with, right?

MR. ANDREWS: Yes.

THE COURT: And did you ever ask them to try the case for you?

MR. ANDREWS: Yes, I did; and all of those lawyers said they would not try the case. They always said that they would have to review the record and it would take six to eight months, and then they weren't sure if they would be prepared to take it.

THE COURT: And was your decision there not to take the case?

MR. ANDREWS: I allowed at least three to four law firms that time, and they never—and I have letters in the file that show that either they left because for some reasons I really don't know. I really—If I knew—

THE COURT: —All right. I'm just telling you; but you know that as far as I'm concerned, that I thought and still believe that it was imperative for you to have a lawyer?

MR. ANDREWS: Yes, I understand that.

THE COURT: And that at least as anybody that—Well, we'll just have to go on.

At any time that you think that you have a lawyer or somebody available, then you should let the Court know.

We can find no indication in the record of a refusal by Judge Nelson of possible counsel because it might set back the trial date, a trial which Judge Nelson was well aware would have to be tried a few days at a time over a period of several months because of his crowded criminal docket.

■ Andrews has argued that the court failed to appoint him counsel. It is clear that there is no constitutional right to appointed counsel in a civil case. *Caruth v. Pinkney,* 683 F.2d 1044 (7th Cir.1982), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983). Title VII does, however, provide the district court with the discretion to appoint counsel in appropriate circumstances.[1] Our review of this matter is guided by an abuse of discretion standard. *Jenkins v. Chemical Bank,* 721 F.2d 876, 879 (2d Cir.1983).

The lack of appointed counsel in this case was not in any way due to a refusal on the part of Judge Nelson to appoint such counsel. Judge Nelson repeatedly urged Andrews to accept legal counsel both before and during the trial. He was willing to appoint either Prince or Hensley. No counsel was appointed either because no counsel would accept the case, as Andrews would have it, or because Andrews was not satisfied with the attorneys he was offered. The claim of error, therefore, is that Judge Nelson abused his discretion either because he did not coerce an attorney into representing Andrews or because he did not coerce Andrews into accepting an attorney chosen by the court.

■ The court could not coerce Andrews into accepting representation he did not want. While there is no constitutional right to self-representation in civil cases, *O'Reilly v. New York Times,* 692 F.2d 863, 867 (2d Cir.1982), there is a statutory right of long standing to such self-representation, 28 U.S.C. § 1654 (1982).[2]

Section 1654 comes to us freighted with history; it calls back visions of days when much litigation, especially on the "law side", was carried on by strong self-reliant citizens who preferred to appeal to the sense of justice of "the country" rather than entrust their causes to lawyers trained in the intricacies of the law.

*O'Reilly,* 692 F.2d at 867. A necessary part of the right of self-representation is that a litigant, especially a plaintiff in a civil case, cannot be coerced into accepting appointed counsel rather than proceeding *pro se. Cf. Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562 (1975) (criminal defendant cannot be coerced into accepting appointed counsel). In this case, although Andrews had asked the court to appoint counsel, it is quite clear that he did not intend to waive his right to refuse such counsel and proceed *pro se* if he was not satisfied with the counsel appointed. Judge Nelson could do no more than provide Andrews with the names of counsel whom he would appoint if Andrews approved and emphasize to Andrews the critical importance of having such counsel. Neither his authority nor duty extended any further.

■ We next consider whether it was an abuse of discretion for Judge Nelson not to coerce an attorney into representing Andrews when the alternative was that Andrews would proceed *pro se.* We do not believe that to the extent Judge Nelson may have allowed the attorneys he contacted to decide for themselves whether they would accept Andrews as a client that there was any abuse of discretion. Andrews had demonstrated himself to be a client who was often unwilling to listen to the advice of counsel and had already expressed a strong interest in proceeding *pro se* by dismissing several lawyers and submitting his own papers to the court. It was very unlikely that Andrews would have been interested in any attorney who was not highly motivated to pursue his case. This was precisely the reason Morris Shubow was fired by Andrews. Under the circumstances, it simply would not have

1. "Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security." 42 U.S.C. § 2000e-5(f)(1) (1982).

2. "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel...." 28 U.S.C. § 1654 (1982).

made sense to coerce an attorney into representing Andrews because the probable outcome of such an appointment would have been the discharge of the attorney and further delay of the case while Andrews prepared to proceed *pro se*. Furthermore, although the facts are not absolutely clear, the primary reason why no attorney was ever appointed was that Andrews never found an attorney *he* wanted and not that Andrews was turned down by an attorney he clearly wanted.

■ Lastly, we address the claim of Andrews that Judge Nelson's frustration with the *pro se* representation prevented him from being an impartial fact finder in this jury-waived trial. Our review of the record suggests just the opposite. Judge Nelson was a model of patience during a twelve-day trial conducted by a plaintiff who was entirely unschooled in the rules of evidence and the examination of witnesses. Judge Nelson treated Andrews with respect and compassion and bent over backwards to explain to Andrews the legal principles which formed the basis for his evidentiary rulings. We find no trace in the record of bias against Andrews or his case.

## IV. DENIAL OF THE MOTION TO AMEND THE COMPLAINT

After a status conference on November 7, 1980, during which it was determined that no settlement could be reached, Judge Mazzone ordered that all further motions be filed within seven days and set trial for December 8, 1980. On November 13, 1980, Bechtel filed a motion to dismiss all three of plaintiff's claims, in part upon the ground that they were time barred. On November 14, 1980, the Union moved for partial summary judgment on similar grounds. On that same day, Fredrick Golder filed a notice of appearance as co-counsel for Andrews and simultaneously filed a motion to amend the complaint to include a claim of wrongful discharge against Bechtel under state law. No pendent state claim against Local 276 was made.

On December 5, 1980, Judge Mazzone disqualified himself due to a conflict with one of Bechtel's attorneys. The case was reassigned to Judge Nelson on December 8. Bechtel wrote Judge Nelson on December 15 bringing him up-to-date on the pending motions. Judge Nelson ruled on the motions for partial summary judgment and dismissal in August of 1981. At that time, he dismissed both the fourteenth amendment claim and the § 1981 claim. By this time, Golder had withdrawn from the case and no mention of the motion to amend was made again until July 27, 1982, which was the second day of trial. On the 27th Andrews submitted a new motion to amend which asked for relief under state law against both Bechtel and Local 276 for wrongful discharge. Andrews did not at that time indicate to Judge Nelson that he was renewing a motion that had, at least in part, been pending for some time and it appears that, as far as Judge Nelson knew, this was an entirely new motion. The motion was summarily denied as "[u]ntimely, too late." Andrews now argues that the motion was not untimely, as it was made twenty months prior to trial, and that no prejudice to defendants would have resulted because no new discovery would have been required. Both Local 276 and Bechtel have argued that the motion was untimely and prejudicial.

■ Federal Rule of Civil Procedure 15(a) provides that amendments to a pleading may be made as a matter of course prior to service of a responsive pleading or within twenty days of initial service of the pleading, but after that "a party may amend his pleading only by leave of the court or by written consent of the adverse party." While such amendments "shall be freely given when justice so requires," Fed. R.Civ.P. 15(a), a district court does have discretion to deny leave to amend "in the face of 'extraordinarily long and essentially unexplained delay.'" *Johnson v. Educational Testing Service*, 754 F.2d 20, 27 (1st Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985) (quoting *Carter v. Supermarkets General Corp.*, 684 F.2d 187, 192 (1st Cir.1982)).

When the motion to add a state law claim against Bechtel was first made it was seven years after the filing of the complaint and twenty-four days prior to the scheduled start of trial. Where such excessive delay is present, "courts have placed the burden upon the movant to show some 'valid reason for his neglect and delay.'" *Hayes and New England Millwork*, 602 F.2d 15, 20 (1st Cir.1979) (quoting *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (5th Cir.1967)). Andrews has argued that the motion to add the state claim was essentially made in response to the motions to dismiss and for summary judgment filed on November 13 and 14 of 1980. He claims that he was lulled into a false sense of security by the lack of a motion to dismiss during the previous seven years and that as soon as he discovered that some of his federal claims were in jeopardy he moved to amend the complaint. We have held, however, that a late motion for summary judgment or dismissal may not in itself justify an excessive delay in moving to amend. *Carter v. Supermarkets General Corp.*, 684 F.2d 187, 192 (1st Cir.1982). Andrews also argues that the state law claim was not available when the complaint was first filed in 1973, but was only announced in 1977 in *Fortune National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977). However, once again the motion for summary judgment is invoked as the reason why an attempt to amend the complaint was made in 1980, rather than in 1977 when the state law claim may have first become viable. This, then, is not an independent ground for the delay. We also note that even in 1980, the motion to amend might have reasonably been considered prejudicial to Bechtel. An addition of a new claim close to trial when discovery is essentially complete and trial strategy already planned invariably delays the resolution of a case, and delay itself may be considered prejudicial, *Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1 (1st Cir.1983), especially where excessive delay has already occurred. It cannot be said that Judge Nelson's denial of the renewed motion to amend after yet another year and a half had passed and the trial was already underway was an abuse of discretion.

As to Andrews' state law claim against Local 276, the case is even stronger. The Union was never named in the 1980 motion to amend. Thus when Andrews moved to add a state claim nine years after the initial complaint was filed, a year and a half after the motion for summary judgment was made and two days into trial, the delay was both excessive and unexplained. Regardless of the similarity of the new claim to one already being tried, there is clear prejudice to a defendant who must suffer another delay through no fault of its own. It was not an abuse of discretion to deny leave to amend the complaint at this juncture in the proceedings.

## V. EXCLUSION OF EVIDENCE

The next issue is whether the district court improperly restricted Andrews from introducing EEOC investigation evidence tending to show classwide discrimination which would have bolstered his individual claim of discrimination. At the beginning of the trial, the court reviewed the list of seventy-eight proposed witnesses submitted by Andrews, which included numerous MCAD and EEOC officials and all his former attorneys. The purpose of this review was to attempt to save trial time by letting Andrews know in advance what kind of testimony would be admissible. At that time, Andrews indicated that a good deal of the EEOC testimony would relate to an alleged conspiracy between the EEOC and the defendants arising out of conciliation agreement between the EEOC and the defendants to which Andrews was not a party. Judge Nelson then made it clear that such testimony would be inadmissible because the EEOC was not a party and its acts were not the subject of the complaint. Andrews also wanted his former attorneys to testify about the information they collected. Judge Nelson explained what hearsay was and told Andrews that the attorneys would not be permitted to give hearsay evidence.

When the trial resumed in June of 1983 after a ten-month recess for settlement negotiations, Judge Nelson reviewed what had taken place at the beginning of the trial and stated several times that regardless of what he advised Andrews about the admissibility of a witness's testimony, Andrews still had the right to call the witness and see what the actual rulings would be. He then mentioned a few of the witnesses listed by Andrews who were connected with MCAD and stated:

> When I ask you for what purpose they were being called, I was made to understand that a lot of them focus around the EEOC hearings and the Massachusetts Commission Against Discrimination. And I suggest that it's unlikely that they'll be able to testify as to much concerning that, since this is not a case against the MCAD or the EEOC, but a case against two defendants that are present here.

Andrews then stated that he wished to call Carroll Brownlee, former director of investigation at MCAD, both to show discrimination and punitive damages. When asked for clarification on Brownlee's testimony, Andrews said:

> They denied me because they said it wasn't timely filed. And therefore I have evidence here to show that Brownlee, or a Massachusetts agency, had the responsibility to protect my rights and anybody else's rights to make sure that that was filed—

Judge Nelson then indicated that this would not be relevant testimony and asked if Andrews intended to have Brownlee testify as to anything else. Andrews indicated that the only other thing that he would testify to was that he signed some document and sent it to the EEOC in a timely fashion. Judge Nelson then told Andrews that this issue had already been resolved in his pretrial order refusing to dismiss the Title VII count despite defendant's claims that it was not timely filed.

Andrews then stated that he wanted to call Lloyd Bell, at that time director of investigation for the EEOC in Texas, to testify about an investigation conducted by the EEOC which led to a finding of probable cause of discrimination by Bechtel and Local 276 against a class. Judge Nelson ruled that the class certification issue was closed, although he had a right to reopen it on appeal, and that testimony designed to support the class action would not be admissible.

Andrews now argues that these conversations had the effect of excluding evidence of classwide discrimination which would have been relevant and admissible in his individual case, in particular, the evidence collected by the EEOC which formed the basis for its compliance reports. He suggests that Judge Nelson's position in these conversations was based upon an erroneous view of the law, i.e., that evidence of classwide discrimination was not admissible in an individual discrimination case.

We note first that none of the evidence in question was actually offered into evidence by Andrews and found to be inadmissible by Judge Nelson. Andrews argues that as a *pro se* plaintiff with a limited understanding of the law, he was intimidated into not offering such evidence by the Judge's preliminary indication that the testimony he wished to offer by EEOC and MCAD personnel would not be admissible. Under Federal Rule of Evidence 103(a)(2), however, a claim of error cannot be predicated upon evidence which is never actually offered to the court. It is impossible for an appellate court to review a nonexistent district court ruling. This rule cannot be bent for *pro se* plaintiffs. The right of self-representation is not "a license not to comply with relevant rules of procedural and substantive law." *Faretta v. California*, 422 U.S. 806, 835 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975). Nor can we fault Judge Nelson for attempting to prevent Andrews from wasting the court's time with inadmissible evidence.

We also note that there is no indication that Judge Nelson considered evidence of classwide discrimination irrelevant. Andrews was permitted to introduce evidence of the treatment of other black welders

referred by Local 276 and tested by Bechtel. He was also permitted to introduce reports made by Bechtel to the EEOC delineating the ethnic breakdown of its work force. The record shows that Judge Nelson specifically allowed such evidence despite defendants' objections of irrelevancy because it "bolster[ed] the allegation that he was denied the job because of his color, and that this was the practice and the whole range of circumstances that existed at the time that he applied."

## VI. THE JUDGMENT FOR THE DEFENDANTS

■ On October 5, 1984, Judge Nelson issued a memorandum and order giving judgment for the defendants, Bechtel and Local 276, on the grounds that Andrews had failed to establish a *prima facie* case of either disparate treatment or disparate impact under Title VII against either defendant. Andrews now challenges both these holdings. The standard of review for an appellate court in a Title VII discrimination case is "whether the district court's Findings of Fact were clearly erroneous or predicated upon an error of law." *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 71 (1st Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

### A. *Disparate Treatment*

■ Andrews makes no claim that the district court applied the incorrect legal rule to his disparate treatment claim. The district court properly analyzed the evidence under the format set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In order to make out a *prima facie* case of discrimination under *McDonnell,* a plaintiff must show by a preponderance of the evidence that: (1) he or she is within a class protected by Title VII; (2) he or she applied for a job for which the employer was seeking applicants and for which he or she had the requisite qualifications; (3) he or she was rejected; and (4) the employer continued to seek applicants with the same qualifications. The only issue of any dispute in the case was whether Andrews had the qualifications to be a welder at the Bechtel project. The district court found that Andrews did not show by a preponderance of the evidence that he was qualified for a welding position at the plant, nor did he show that Bechtel filled positions with other applicants of equal or lesser skill. Andrews claims that the evidence of his qualifications as a welder combined with the discriminatory nature of the welding test prove that he was qualified for the position. He further claims that the records submitted into evidence of white welders hired by Bechtel show that these welders were not as well qualified as he was.

■ The district court reviewed the evidence concerning Andrews' performance on the ASME welding test and found that it did not support an inference that his "root pass" was within the ASME standards:

(a) plaintiff had done little or no welding at all for the two years preceding the test; (b) his earlier welding was performed under the Navy Code, not the ASME code; (c) his welding experience was largely on a significantly different material than was used in the Bechtel test; (d) his earlier pipe welding involved use of backing rings or inserts rather than open butt root passes; (e) he may not have performed an open butt root pass for six years preceding the Bechtel test; (f) even as a pipewelder specialist at the shipyard, plaintiff may have had a rejection rate as high as 35%; and (g) many welders with plaintiff's type of experience failed at least one test at Bechtel.

The district court refused to assume either that Andrews must have been qualified merely because of his previous experience or that white welders who passed the test and were hired were less qualified than Andrews because they had less prior experience. We cannot find this to be clearly erroneous. The district court properly found that Andrews had failed to establish a *prima facie* case of disparate treatment against Bechtel.

 Andrews also claims that the district court erred in finding that he had not made a *prima facie* case of disparate treatment by Local 276, in particular, the Union's failure to re-refer him to Bechtel for a second test. Andrews does not appear to challenge the district court's finding that no *prima facie* showing of disparate treatment was made with regard to the initial referral to, the job site or the grant of membership in the Union. Andrews quite clearly testified that he never requested a second referral from the Union. The Union policy was to provide re-referrals only upon application. Andrews, therefore, failed to meet the second part of the *McDonnell* test requiring that he apply to be re-referred.

## B. *Disparate Impact*

Andrews first argues that the district court's finding of no *prima facie* showing of a disparate impact on black welders of Local 276 referral practices ignores the evidence before the court. In particular, Andrews points to the Union's practice of referring union members before nonunion applicants, where there were no black members of the Union in 1960, and the practice of issuing work permits in order of application, which resulted in black men with more years of experience having to wait behind white men with less years of experience. Finally, Andrews argues that the failure of the Union to keep records of the race of applicants precluded him from showing the statistical disproportion between blacks who were referred and re-referred and whites who were referred and re-referred.

 In order to establish a *prima facie* case of discrimination based upon disparate impact, a plaintiff must show that a facially neutral employment practice had a significantly discriminatory impact. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64 (1st Cir.1984). The district court found that Andrews had failed to make out a *prima facie* case with regard to Local

276's membership practices because, while the Local admitted that it had no black members in 1969, Andrews presented no evidence on the racial composition of the membership pool during that period. Without that information, the significance of the lack of black members could not be assessed. Andrews argues that information on the membership pool was available to the court even though it had not been offered into evidence. He suggests that Judge Nelson should have taken judicial notice of evidence presented to Judge Mazzone on the class certification issue which showed that there were almost 1,000 black welders in the Boston metropolitan area at that time. A district court, however, may not base a judgment upon evidence not formally admitted during the trial. This would violate the basic tenets of the adversary system. Furthermore, this evidence had doubtful relevancy. Local 276's jurisdiction is primarily in the southern part of Massachusetts and includes only a small fraction of the metropolitan area. The figure of almost 1,000 welders quoted by Andrews is based upon the Boston metropolitan area and not the area served by Local 276.

 The district court also found that Andrews had failed to make a *prima facie* case with regard to the disparate impact of Local 276's referral practices. While the Union's policy of referring union members first, where there were no black union members, might have had a disparate impact on black welders, Andrews did not provide the figures necessary to demonstrate that the practice did indeed have a discriminatory impact. What testimony there was on the subject suggests that this practice had a very minimal impact since the Union had no more than twelve members who could weld and Bechtel hired hundreds of welders. Furthermore, the practice of referring nonmembers on a first-come, first-served basis without record of the race of the applicant is on its face racially neutral. Andrews presented no ev-

idence to suggest that its effect was otherwise. The district court's finding of no *prima facie* showing of disparate impact against Local 276 was not clearly erroneous.

■ Nor was it clearly erroneous for the district court to find that Andrews had failed to make a *prima facie* case of disparate impact against Bechtel. The district court's analysis speaks for itself:

> For the court to assess whether Bechtel's hiring and testing practices did, in fact have an adverse impact on blacks, it would be necessary that some or all of the following information be in evidence: The definition of the appropriate labor pool; the proportional representation of blacks and whites in the labor pool; the number of people applying to Bechtel for employment as pipewelders, and the proportional representation of blacks and whites in the applicant group; the number of pipewelders hired and tested by Bechtel, and proportional racial representation; the number or proportion of white pipewelders who passed the test, who failed the test based on visual examination of the root pass, and who were allowed to retest; and the number or proportion of black pipewelders who passed the test, who failed the test based on visual examination of the root pass, and who were allowed to retest. The evidence before the court contains none of this information.

The district court went on to say that what evidence was before the court, which included the records and experiences of both black and white welders who failed the welding test after a visual examination and who were given and passed a second test after re-referral, simply did not support a finding that Bechtel's hiring, testing and termination practices had an adverse impact on blacks. Our review of the record convinces us that the district court was correct in its assessment of the evidence.

*Affirmed.*

