**EAGLE EYE FISHING CORPORATION, et al., Petitioners, Appellants,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, et al., Respondents, Appellees.**

No. 93–1740.

United States Court of Appeals, First Circuit.

Argued Feb. 8, 1994.

Decided March 17, 1994.

Edward F. Bradley, Jr., Portland, ME, for appellants.

Joan M. Pepin, Atty., U.S. Dept. of Justice, with whom Myles E. Flint, Deputy Asst. Atty. Gen., Washington, DC, A. John Pappalardo, U.S. Atty., Boston, MA, Edward J. Shawaker, Charles W. Brooks, Patricia Kraniotis, and Karen Antrim Raine, Washington, DC, were on brief, for appellees.

Before SELYA, BOUDIN and STAHL, Circuit Judges.

SELYA, Circuit Judge.

The marlin's tail, a central image in one of the little masterpieces of modern literature,[1] today finds a new habitat: we must pass upon a fine levied by the National Oceanic and Atmospheric Administration (NOAA) for possession of such a tail. In the last analysis, however, the appeal does not turn on matters of either ichthyology or literature, but on pedestrian principles of procedural default. We conclude that, on the facts of this case, the raise-or-waive rule must be applied strictly, and, consequently, we affirm the district court's dismissal of appellants' petition for judicial review.

## I

### The Tale of the Tail

On April 28, 1989, in San Juan, Puerto Rico, Mahlon Pickering, an agent of the National Marine Fisheries Service, observed the severed tail of a large fish hanging from the rigging of the F/V EAGLE EYE. The agent boarded the craft, interrogated a crew member, inspected the caudal appendage, and launched the investigation that led NOAA to charge the vessel's owner, petitioner-appellant Eagle Eye Fishing Corporation, and its captain, petitioner-appellant Bruce Beebe, under the Magnuson Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1882 (1988), and the regulations promulgated pursuant thereto, see 50 C.F.R. §§ 644.7(d), 644.22 (1990).[2] The regulations prohibit not only capture, but mere possession, of a billfish such as a blue marlin shoreward of this nation's exclusive economic zone (EEZ).[3]

Appellants denied the charges. Though able to afford counsel, they chose to appear pro se at the ensuing administrative hearing. They did not object when the vessel's logbook was introduced into evidence. By like token, they did not controvert expert testimony that, assuming a Caribbean catch, the tail could only belong to a blue marlin. Instead, appellants argued that NOAA could not prove with the requisite degree of probability that the tail found aboard appellants' vessel belonged to a marlin caught in Caribbean waters. They suggested that the tail perhaps belonged to a black marlin.[4]

The administrative law judge (ALJ) found that the fish had been snagged in Caribbean waters frequented by the blue (but not the black) marlin. He rested that determination on several pieces of evidence, including, *inter alia,* (1) the logbook, which verified the vessel's coordinates at all relevant times; (2) a swordfishing permit, which generally defined the vessel's fishing area; (3) testimony of a crew member regarding the vessel's location

---

1. *See* Ernest Hemingway, *The Old Man and the Sea* 99 (Chas. Scribner's Sons 1952) (describing the marlin tail as "higher than a big scythe blade and a very pale lavender above the dark blue water").

2. Former section 644.7(d) is now recodified as 50 C.F.R. § 644.7(e) (1993).

3. To be precise, the regulations proscribe possession of such a billfish "by a vessel with a pelagic longline or drift net aboard or harvested by gear other than rod and reel," 50 C.F.R. § 644.7(d) (1990), "shoreward of the outer boundary of the EEZ," *id.* § 644.22. The regulations delineate the EEZ as that span of the sea from the shoreward boundary of each coastal state to points 200 nautical miles from the "baseline," or low water line, along the state's coast. *See* 50 C.F.R. § 620.2; *see also* Thomas J. Schoenbaum, Admiralty and Maritime Law § 2–4, at 26 (1987). Appellants do not dispute that the F/V EAGLE EYE is a vessel subject to 50 C.F.R. § 644.7(d). Similarly, they do not dispute that San Juan Harbor lies within this nation's EEZ.

4. The black marlin is an unprotected species indigenous to the Pacific Ocean and the Indian Ocean.

during the voyage; and (4) Agent Pickering's opinion that the fish seemed to have been caught only a day or two before the ship had docked, or, stated differently, four to five days before he first observed it. Based principally on this determination as to the situs of the catch, the ALJ decided that the tail belonged to a blue marlin and fined appellants $5,250.

Appellants secured counsel and filed a petition seeking further administrative review, *see* 15 C.F.R. § 904.273. In the course of that review, appellants for the first time argued that NOAA violated its own confidentiality regulations by publicly disclosing information contained in the logbook.[5] The NOAA Administrator equivocated about the merits of this argument, but concluded that, in all events, appellants were barred from advancing it because they had not raised it before the ALJ.[6]

Appellants then sought judicial review pursuant to 16 U.S.C. § 1861(d). In their complaint, they again challenged the use of the logbook at the administrative hearing. The district court dealt appellants a double blow; the court upheld the agency determination on the ground of procedural default, and also concluded that, wholly apart from the logbook, there existed ample evidence to underbrace the ALJ's finding that appellants unlawfully possessed a blue marlin within the EEZ. This appeal followed.

## II

### Troubled Waters

The doctrine of administrative waiver is a subset of the broader doctrine of procedural default. It teaches that, "[i]n the usual

administrative law case, a court ought not to consider points which were not seasonably raised before the agency." *Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.,* 984 F.2d 514, 523 (1st Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993). This doctrine serves a variety of worthwhile ends, including judicial economy, agency autonomy, and accuracy of result.[7]

To be sure, the general rule of administrative waiver is ringed with exceptions. *See Massachusetts DPW,* 984 F.2d at 524. Appellants seek to invoke one such exception, applicable to significant questions of law, especially those of constitutional magnitude which are not only likely to arise again but also are susceptible to resolution on the existing record. *See, e.g., United States v. La Guardia,* 902 F.2d 1010, 1013 (1st Cir.1990) (developing this exception in the context of an analogous rule involving an appellate court's treatment of questions not raised in the trial court). In furtherance of this attempt, appellants assert that their confidentiality argument is substantive and bears on NOAA's central mission of fisheries management, raising the specter that the agency's misuse of routinely collected information could drive fishermen to falsify their records. We are unpersuaded. If the NOAA Administrator shared appellants' fear, then he could have reached out to decide the confidentiality issue on administrative review as a matter of discretion. The fact that he did not do so speaks volumes. We add, moreover, that appellants come nowhere near satisfying the other requirements of the *La Guardia* exception. For example, there is no reason to think that this question will recur—after all, it apparently has not arisen on any other

5. Logbooks of this type must be kept as a matter of course by all regulated fishing vessels, and the vessels must record certain specified information therein. *See* 50 C.F.R. § 603. The information is gathered for use in the agency's fisheries management program and is to be held in confidence, *see id.,* subject to certain specified exceptions, *see, e.g.,* 50 C.F.R. §§ 603.5, 603.7.

6. The Administrator based his finding of waiver on a procedural regulation providing that:

   Issues of fact or law not argued before the [ALJ] may not be raised on review unless they were raised for the first time in the initial

decision, or could not reasonably have been foreseen and raised by the parties during the hearing.

15 C.F.R. § 904.273(d).

7. These interests are similar, but not identical, to the main interests underlying the concept of administrative exhaustion. *See, e.g., Ezratty v. Puerto Rico,* 648 F.2d 770, 774 (1st Cir.1981); *United States v. Newmann,* 478 F.2d 829, 831 (8th Cir.1973); *see also Massachusetts DPW,* 984 F.2d at 523 n. 8. This is as it should be, for both rules are aimed at assuring full development of fact and law at the agency level.

occasion in the seventeen-year history of the Magnuson Act—and, at any rate, the question cannot confidently be resolved on the existing record.[8]

■ Appellants have a second hook on their line. They tell us that they proceeded pro se before the ALJ, represented only by a corporate officer—and the officer could not have been expected to understand the significance of admitting the logbook into evidence. Appellants view this circumstance as sufficient to justify an exception to the administrative waiver rule, either because, in general, the absence of counsel should insulate parties from the usual strictures of the rule, or because, in particular, appellants should be found to come within the regulatory exception that permits a new argument to be raised if it "could not reasonably have been foreseen" at the time of the initial hearing, 15 C.F.R. § 904.273(d), quoted *supra* note 6. We find neither of these theorems to be convincing.

■ A pro se litigant, like any litigant, is guaranteed a meaningful opportunity to be heard. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982). While courts have historically loosened the reins for pro se parties, *see, e.g., Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (suggesting that courts should construe a pro se litigant's pleadings with liberality), the "right of self-representation is not 'a license not to comply with relevant rules of procedural and substantive law.'" *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 140 (1st Cir.1985) (quoting *Faretta v. California,* 422 U.S. 806, 835 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975)), *cert. denied,* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). The Constitution does

not require judges—or agencies, for that matter—to take up the slack when a party elects to represent himself. *See McKaskle v. Wiggins,* 465 U.S. 168, 183–84, 104 S.Ct. 944, 953–54, 79 L.Ed.2d 122 (1984) (explaining that courts need not "take over chores for a pro se defendant that would normally be attended to by trained counsel as a matter of course").

Although *Faretta* and *McKaskle* are criminal cases, the principles for which they stand are fully applicable in this instance. Indeed, there is a long line of authority rejecting the notion that pro se litigants in either civil or regulatory cases are entitled to extra procedural swaddling. *See* Julie M. Bradlow, Comment, *Procedural Due Process Rights of Pro Se Civil Litigants,* 55 U.Chi.L.Rev. 659, 668 nn. 41, 42 (1988) (collecting cases); *see also Andrews,* 780 F.2d at 140 (declining to carve out a pro se exception to Fed.R.Evid. 103(a)(2)). While we can imagine cases in which a court appropriately might extend special solicitude to a pro se litigant, *see, e.g., Rana v. United States,* 812 F.2d 887, 889 n. 2 (4th Cir.1987) (dictum), the instant case is clearly not cut from that cloth. Appellants simply appear to have been penny wise and pound foolish; they knowingly chose to handle their own defense, forsaking professional assistance; they lost; and no miscarriage of justice looms. Consequently, appellants must reap the predictable harvest of their procedural default.

■ We give short shrift to appellants' claim that, due to their pro se status, the confidentiality argument "could not reasonably have been foreseen and raised," 15 C.F.R. § 904.273(d), during the initial round of hearings. The exception limned in this regulation is a narrow one. It should be applied sparingly. And, moreover, foresee-

---

8. The government denies that its use of the logbook transgressed the confidentiality regulation. To the contrary, it asserts that all individuals who had access to the statistics fell within the confidentiality exemptions permitting disclosure to federal employees responsible for monitoring and enforcement of fisheries management plans, *as well as to other NOAA personnel on a need-to-know basis. See* 50 C.F.R. § 603.5. The government also argues that limited use of otherwise confidential data, such as logbook information, is frequently allowed for purposes of enforcement

proceedings in federal courts, *see, e.g., United States v. Kaiyo Maru No. 53,* 699 F.2d 989, 992 (9th Cir.1983); *United States v. Daiei Maru No. 2,* 562 F.Supp. 34, 35 (D.Alaska 1982), as well as in administrative proceedings, *see, e.g., In re Ostrovsry,* 5 Ocean Resources and Wildlife Reporter (ORW) 578 (NOAA 1987); *In re Shoffler,* 3 ORW 618 (NOAA 1984). The administrative record is not sufficiently well developed to enable enlightened resolution of these contentions—a circumstance which, in itself, militates strongly against excusing appellants' administrative waiver.

ability in this context must be judged according to a standard of objective reasonableness. *Cf. Jorgensen v. Massachusetts Port Auth.,* 905 F.2d 515, 521 (1st Cir.1990) (explaining, in the tort context, that foreseeability should be judged by means of a similar standard). Hence, parties who choose to represent themselves must be held to anticipate what trained counsel would ordinarily anticipate. In other words, if a reasonably well-prepared litigant could have foreseen an issue, and would have raised it, then the exception contained in the regulation does not pertain. So it is here.

## III

### *An Anchor to Windward*

Before ending our voyage, we add that any error was harmless. We have carefully reviewed the record and are confident that suppression of the logbook would have had no effect on the outcome of the proceeding. Although the logbook entries comprise the only evidence establishing the *precise* location of the F/V EAGLE EYE, the record makes manifest that the agency's case depends upon the *general* location of the vessel, not its exact longitude and latitude at any given moment. Here, substantial evidence apart from the logbook entries establishes beyond serious hope of contradiction that the vessel was in the Caribbean at the time it caught the fish to which the offending tail was once attached. That evidence, without more, was fully sufficient to confirm the species of fish and, consequently, to warrant a finding that the regulations had been infringed.

## IV

### *The Tail of the Tale of the Tail*

We need go no further. In many respects, these proceedings parallel Hemingway's novella. Before the ALJ, appellants "tried not to think but only to endure." Hemingway, *supra,* at 50. On administrative review, they acted as if "[e]ach time was a new time." *Id.* at 73. But these apothegms make better sense on the open sea than they do in open court. Here, at long last, appellants must recognize that, in Hemingway's words, they are "beaten now finally and without remedy." *Id.* at 131. The civil penalty assessed by NOAA must be paid.

*Affirmed.*