**NORTHERN WIND, INC.,**
**Plaintiff, Appellant,**

v.

**William M. DALEY, Secretary of Commerce; United States Department of Commerce, National Oceanic and Atmospheric Administration; and United States of America, Defendants, Appellees.**

No. 99–1526.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1999.

Decided Dec. 29, 1999.

Michael A. Collora, with whom Eve Slattery and Dwyer & Collora, LLP, were on brief for appellant.

Todd S. Kim, Attorney, with whom Richard Monikowski, Attorney, Robert L. Klarquist, Attorney, Lois J. Schiffer, Assistant Attorney General, Department of Justice, Environment & Natural Resources Division, and Joel La Bissonniere, National Ocean and Atmospheric Administration, Office of General Counsel, were on brief for appellees.

Before SELYA, Circuit Judge,
COFFIN, Senior Circuit Judge, and
STAHL, Circuit Judge.

STAHL, Circuit Judge.

Plaintiff Northern Wind, Inc. ("Northern Wind") appeals the district court's grant of summary judgment for Defendant, the National Oceanic and Atmospheric Administration ("NOAA"). The decision upheld a civil penalty assessed against Northern Wind pursuant to 16 U.S.C. § 1858, and a finding by an Administrative Law Judge ("ALJ") that Northern Wind was liable for the possession of nonconforming Atlantic sea scallops under the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1857, as implemented by 50 C.F.R. § 650.7(a).[1]  Because the

ALJ's decision is supported by substantial evidence, we affirm.

## I.

### Background

Northern Wind, the owner of a seafood processing plant in New Bedford, Massachusetts, entered into an agreement with Ocean Obsession, Ltd. ("Ocean Obsession"), a seafood supplier, for the storage of Atlantic sea scallops. The agreement gave Ocean Obsession the right to offload and store at Northern Wind's refrigerated facilities its catches of sea scallops. Ocean Obsession warranted that all of the scallops it stored in the cooler would be in conformance with the Magnuson Act and other maritime regulations. In exchange, Ocean Obsession gave Northern Wind a right of first refusal on the scallops stored in its cooler.

Ocean Obsession's storage area was located in a locked, alarmed, and partitioned off portion of Northern Wind's seafood cooler with a separate entrance. This arrangement allowed Ocean Obsession employees unlimited access to the cooler at any time. The only other person with access to this separate portion of the cooler was the owner of Northern Wind. Ocean Obsession often would deliver scallop stock to the facility after Northern Wind's regular business hours. On these occasions, Northern Wind would view the stock stored in the cooler on the next business day. Nevertheless, Northern Wind had access to the cooler at all times, even if a representative of Ocean Obsession was not present. If Northern Wind found the stock acceptable, it would negotiate a price with Ocean Obsession for its purchase; if not, Northern Wind would reject the product and Ocean Obsession was free to seek other buyers.

On September 28, 1992, members of the National Marine Fisheries Service

---

1. We reference and apply the Code of Federal Regulations in effect in 1992, when the events underlying this dispute occurred.

("NMFS"), part of the NOAA, arrived at Northern Wind's facilities to inspect its stock for conformity with the Magnuson Act.[2] The previous night, Ocean Obsession had offloaded and stored 12,439 pounds of scallops at Northern Wind's facilities. This harvest was made up of one hundred bags ("the Canton bags") that were shucked in the United States and two hundred bags ("the Weymouth bags") that were shucked at sea. The NMFS agents took ten random samples of scallops from these three hundred bags, to determine whether they conformed with the applicable regulations. *See* 50 C.F.R. § 650.7(a) (making it unlawful to possess scallops that are too small "at or prior to [their] first [mixing, sorting, or processing] transaction in the United States"). At the time, the maximum allowable weight for Atlantic sea scallops was thirty meats per pound, which means that any sample of scallops weighing one pound could contain no more than thirty shucked scallops. However, the samples the NMFS took from both sets of bags and measured at Northern Wind had an average weight of 75.8 meats per pound. The NMFS thus seized all of the scallops, notified the NOAA of the violation, and fined Northern Wind $35,-000.

Subsequently, the NOAA issued to Northern Wind a Notice of Violation and Assessment, charging it with the possession of nonconforming Atlantic sea scallops in violation of 50 C.F.R. § 650.7(a). Northern Wind requested a hearing to challenge whether the NMFS seized the scallops after the first transaction in the United States, contending that the scallops had been shucked on land prior to being stored, thus they were not be subject to the regulation because the shucking was the first transaction in the United States. Northern Wind also challenged whether it actually "possessed" the scallops within the meaning of the statute.[3] An ALJ held a three-day administrative hearing on these issues, but retired prior to issuing an opinion. A second ALJ issued an initial decision two years later based upon the existing record. That ALJ found that while the NMFS seized scallops from both the Canton bags and the Weymouth bags, only those from the Weymouth bags evidenced a violation because they were shucked at sea and had not been mixed, sorted, or processed after they landed in the United States. The deciding ALJ ordered the NOAA to reimburse Ocean Obsession for the improperly seized Canton bags and further found that Northern Wind did possess all of the offending scallops within the meaning of the statute. The ALJ thus upheld the fine imposed for the Weymouth bags.

Both the NOAA and Northern Wind appealed the ALJ's decision to the Deputy Undersecretary of the NOAA.[4] The NOAA challenged its obligation to pay compensation for the Canton scallops, and Northern Wind alleged various procedural errors. Northern Wind also raised a new argument on appeal, asserting that because the ALJ found that only the Weymouth scallops were nonconforming and because the Weymouth and Canton scallops were "mixed" together in the cooler, it follows that all of the random samples had been mixed, meaning they had been through their first transaction in the United States and were not subject to the regulation at issue. The Deputy granted the NOAA's challenge to the compensation order and summarily denied Northern Wind's peti-

2. Typically, the NMFS performs inspections of storage facilities at random. Sometimes, however, it receives information of a possible Magnuson Act violation, which prompts the inspection. It is unclear what caused the inspection in this case.

3. Ocean Obsession was also issued a Notice of Violation and Assessment, was assessed a fine

for the violation and was a party to the administrative hearing requested by Northern Wind.

4. Ocean Obsession did not appeal the findings of the ALJ or join the petition for judicial review in the district court and therefore is not a party to this appeal.

tion for discretionary review. The Deputy did not reach the merits of Northern Wind's appeal.

Northern Wind then filed suit in the District of Massachusetts, seeking judicial review of the issues it raised in the original administrative hearing, but did not reassert the mixing argument that the Deputy denied. Both Northern Wind and the NOAA filed cross-motions for summary judgment, and after a hearing, the district court remanded the case to the ALJ to rule as a matter of law on whether 50 C.F.R. § 650.7(a) requires "knowing" possession of nonconforming scallops. On remand, the ALJ determined that the regulatory offense imposed strict liability and did not require scienter. The case returned to the district court, which granted summary judgment for the NOAA. Northern Wind appeals.

## II.

### Standard of Review

We review a district court's grant of summary judgment de novo. *See Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir.1997); *Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.*, 984 F.2d 514, 520 (1st Cir. 1993). Here, however, the review is further limited because "the Magnuson Act incorporates the familiar standard of review associated with the Administrative Procedure Act (APA)." *Associated Fisheries*, 127 F.3d at 109; *see also* 16 U.S.C. § 1855(b). That standard accords great deference to agency decision-making; the agency's decision is presumed valid, and judicial review is solely to determine whether substantial evidence in the record supports the decision. *See Associated Fisheries*, 127 F.3d at 109; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, although an agency's answers to questions of

law require somewhat greater scrutiny, the court owes "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

## III.

### Discussion

Northern Wind raises three arguments on appeal. First, it contends that Ocean Obsession mixed together the two shipments of scallops before the NMFS measured them, and that this mixing puts them beyond the reach of the applicable regulations. *See* 50 C.F.R. §§ 650.7(a), 650.2. Second, Northern Wind contends that it did not "possess" the scallops within the meaning of those regulations. Finally, Northern Wind contends that only "knowing" possession is proscribed by the regulations, and it did not "knowingly" possess the scallops. We will address each contention in turn.

### A.

As we have noted, Northern Wind originally argued to the ALJ that by the time the NOAA inspected the allegedly nonconforming scallops, they already had been shucked on land, making it impossible to determine if prior to shucking they conformed to the regulations.[5] As Northern Wind concedes in its brief, the "primary issue" before the ALJ was "whether the seized scallops originated from shell stock shucked at sea," in which case they would be subject to regulation, "or on land," in which case they would not. However, Northern Wind presented a different theory in its petition for discretionary review of the ALJ's decision. Rather than arguing to the Deputy that the scallops had been shucked on land, Northern Wind claimed that Ocean Obsession's combined

---

5. The deciding ALJ rejected the argument that all of the scallops had been shucked on land. The ALJ specifically found that there

were two separate shipments, one that was shucked on land and one that was shucked at sea.

carriage of the Canton and Weymouth bags to its facilities constituted a mixing transaction that put the scallops outside of the regulations' reach.

■ The failure to raise this argument to the ALJ constitutes an administrative waiver, which precludes its assertion on appeal. *See* 15 C.F.R. § 904.273(d) (rendering issues of law or fact waived unless "they were raised for the first time in the initial decision, or could not reasonably have been foreseen and raised by the parties during the hearing"). Under most circumstances, courts will not consider issues that were not raised in prior administrative proceedings. *See Massachusetts Dep't of Pub. Welfare,* 984 F.2d at 523. This rule preserves "judicial economy, agency autonomy, and accuracy of result" by requiring full development of issues in the administrative setting to obtain judicial review. *Eagle Eye Fishing Corp. v. United States Dep't of Commerce,* 20 F.3d 503, 505 (1st Cir.1994). The only exceptions to this rule are for significant issues of law that are jurisdictional in nature, constitutional in magnitude or otherwise so compelling as to require judicial review. *See Eagle Eye,* 20 F.3d at 505; *Massachusetts Dep't of Pub. Welfare,* 984 F.2d at 524.

Northern Wind concedes that its mixing argument does not fall within any exception to the waiver rule, but maintains that the issue was not waived because it sufficiently was raised in the original ALJ hearing and reasserted in the administrative appeal. We disagree. The record of the original administrative hearing indicates that Northern Wind only raised issues of where the scallops were harvested, whether the scallops were shucked at sea or on land, and whether Northern Wind had actual possession of them. The first mention of the mixing argument came, and failed, at the discretionary administrative appeal. Northern Wind advances no reason why it could not have raised the mixing issue at the administrative hearing before the original ALJ, who allowed testimony regarding the two separate ship-ments. The deciding ALJ also made a specific finding in his decision based upon the record of the hearing, that there were two separate shipments at the storage facility. Because Northern Wind failed to raise the mixing argument in the appropriate administrative venue, we find it administratively waived.

## B.

■ Northern Wind also argues that it never had possession of the offending scallops. More specifically, Northern Wind contends that possession requires dominion or control over an object, creating a possessory property right in that object. It asserts that its agreement to allow Ocean Obsession to store scallop stock at its facilities was merely a lease or other contractual right, which did not create a possessory right in the scallops or otherwise amount to possession.

■ As we have mentioned, we accord substantial deference to the agency's interpretation of its own regulations. *See Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381. "[T]he agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

The regulation that implements the Magnuson Act makes it unlawful to possess nonconforming scallops. *See* 50 C.F.R. § 650.7(a). The deciding ALJ read the term "possession" in the regulation not to require ownership of the scallops and concluded that Northern Wind possessed the scallops because it allowed them to be stored at its processing facility. This finding is clearly not erroneous and is consistent with other NOAA cases interpreting the term "possession" under these regulations. *See In re Whitney,* 6 O.R.W. 479 (NOAA 1991) (including in the definition of "possession" having and holding as property or having a "just right" to); *In re L.D. Amory & Co.,* 5 O.R.W. 100 (NOAA 1988)

(finding a seafood processor in "possession" of nonconforming scallops because it allowed undersized scallops to be offloaded at its facility and it assisted in packing and icing the scallops for transport, storage, and resale); *In re Axelsson & Johnson Fish Co.,* 5 O.R.W. 51 (NOAA 1987) (finding seafood dealers to be in possession of nonconforming scallops because they allowed scallops to be offloaded at their docks with their equipment).

The evidence at the hearing demonstrated that Northern Wind provided Ocean Obsession with storage space and unlimited access to that space for the storage of its offloaded scallops. The evidence also established that Northern Wind could inspect the scallops at will, could choose to take and purchase the scallops, and had a "just right" to them because it could prevent Ocean Obsession from taking any action on the scallops until it had exercised its right of first refusal. On the basis of this evidence, we cannot say that the ALJ's interpretation of the term "possession" was plainly erroneous or inconsistent with the NOAA's regulations. Nor can we say that the ALJ's application of the law to the facts was not supported by substantial evidence.

### C.

█ Northern Wind's final argument is that the regulation requires "knowing" possession before a civil penalty can be imposed. It claims that it did not know the scallops had been delivered, that it had not had an opportunity to inspect them, and that it was unaware of their nonconformance under the regulations, or even of their presence.

██ This argument fails. As a general matter, scienter is not required to impose civil penalties for regulatory violations when the regulation is silent as to state of mind. *See Tart v. Massachusetts,* 949 F.2d 490, 502 (1st Cir.1991). Further, a mens rea element is never presumed for regulatory offenses. *Id.; but cf. Moris-*

*sette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (finding that mens rea is presumptively required for criminal offenses). Moreover, scienter never has been required for violations of public welfare regulations because they " 'are not in the nature of positive aggressions or invasions, ... but are in the nature of neglect where the law requires care, or inaction where it imposes a duty.' " *United States v. White Fuel Corp.,* 498 F.2d 619, 622 (1st Cir.1974) (quoting *Morissette,* 342 U.S. at 255–56, 72 S.Ct. 240). Finally, " '[s]cienter is not an element of a civil defense under the [Magnuson Act]. Because conservation-related offenses under the [Magnuson Act] are strict liability offenses, [Northern Wind]'s protests as to [its] state of mind are irrelevant.' " *In re Whitney,* 6 O.R.W. at 483 (quoting *In re Alba,* 2 O.R.W. 670, 673 (NOAA 1982)); *accord In re El Jefe,* 5 O.R.W. 453, 455 (NOAA 1989); *In re Meredith Fish Co.,* 4 O.R.W. 66, 67 (NOAA 1985).

### IV.

### Conclusion

For the reasons stated, the district court properly entered summary judgment in favor of the NOAA. Northern Wind previously had waived its mixing argument by failing to argue it at the first administrative hearing. Moreover, the deciding ALJ's determinations that Northern Wind possessed the scallops and that the regulation has no scienter requirement were not plainly erroneous and are consistent with the regulation.

*Affirmed.*