# United States Court of Appeals

## For the First Circuit

No. 13-1776

FRONTIER FISHING CORP.,

Plaintiff, Appellant,

v.

PENNY PRITZKER; KATHRYN D. SULLIVAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Stephen M. Ouellette, for appellant.
Christine J. Wichers, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellees.

October 24, 2014

**KAYATTA, Circuit Judge**.    The National Oceanic and Atmospheric Administration ("NOAA") determined Frontier Fishing liable for trawling in a restricted gear area in violation of regulations promulgated under the Magnuson-Stevens Fishing Conservation and Management Act, 16 U.S.C. §§ 1801-1891d.    NOAA fined Frontier Fishing $10,000 and suspended one-quarter of Frontier Fishing's seasonal fishing days under its Northeast Scallop Days-at-Sea Permit. Frontier Fishing appeals, arguing that the record lacks substantial evidence for a rational finding that its vessel trawled in the restricted area, and challenging other aspects of the agency proceedings. Largely for reasons given by the district court, we affirm.

## I. Background

The lengthy background out of which this appeal arises covers nearly seventeen years and is impressively reviewed in the most recent district court opinion. See Frontier Fishing Corp. v. Locke, No. 10-10162, 2013 WL 2090551 (D. Mass. May 13, 2013). We repeat only as much as is necessary to explain our ruling.

### A. The Night of the Violation

On the evening of October 16, 1997, the crew of the Coast Guard cutter *Spencer* detected a radar contact up to one mile inside Restricted Gear Area 1, southeast of Nantucket. From October 1 to June 15, Restricted Gear Area 1 was open only to fixed fishing

gear, like lobster traps marked with "high flyers."[1] The applicable regulations prohibited the use of mobile fishing gear, like trawl nets. See 50 C.F.R. § 648.14(a)(98) (1997).

Following the crew's initial report of a contact in the restricted area, *Spencer*'s commander, Charley Diaz, verified the contact on bridge radar, and assigned identification number 8174 to the object indicated by the radar. At 21:30, a Coast Guard lookout observed a white light on the horizon. Crew members thereafter maintained visual contact with the lit object using oversized binoculars known as "big eyes." As the Coast Guard cutter got closer, crew members observed green over white lights, indicating a fishing vessel trawling at night. Commander Diaz then directed his crew to plot the radar contact's location. At 21:40, the Coast Guard proceeded to record the following data: *Spencer*'s own position using its navigational system and DGPS, which determines and records location in longitude and latitude; the radar range and bearing of target 8174; and the course and speed of target 8174 as determined by the Command Display and Control system. Using this data, the Coast Guard plotted the location of radar contact 8174 at 21:40 approximately seven-tenths of a mile inside the restricted area.

---

[1]A high flyer is a radar reflector, attached to a lobster trap buoy, that assists lobster boats locating their traps.

In addition to recording data on electronic equipment, other members of *Spencer*'s crew simultaneously used an alidade[2] to determine by sight the bearing of the observed lights. Commander Diaz himself checked the approximate position of the contact both visually and through radar equipment. The Coast Guard crew did not detect by sight or radar any other vessels in the area at that time. Shortly after determining that the 21:40 radar contact was within the restricted gear area, the Coast Guard altered course to intercept the target at a high rate of speed. The Coast Guard ultimately recorded range and bearing data for radar contact 8174 three additional times showing it within the restricted area, at 21:47, 21:52, and 21:58. We note that the various readings estimate location at the time of the reading without implying that contact 8174 moved in a straight line from one location to the other.

At 22:00, *Spencer* closed on a fishing vessel that all parties agree was *Settler*, a 90-foot trawler owned by Frontier Fishing, which had departed New Bedford, Massachusetts earlier that day on a monkfish trawling expedition. Commander Diaz estimated that *Settler* was 1,000 yards off *Spencer*'s starboard side at 22:00. Commander Diaz visually confirmed that *Settler* had mobile fishing gear deployed off its stern. *Spencer* then quickly turned around *Settler* and ended up on its port quarter, where *Spencer* remained

---

[2]"A telescope mounted on a compass repeater and used as part of a ship's navigational equipment for taking bearings." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 53 (1986).

-4-

parallel to *Settler* for several minutes. It is undisputed that this interception occurred just outside the restricted gear area, at approximately 22:08. The Coast Guard maintained continuous visual contact with the lit object it had observed throughout its approach that night.

The Coast Guard subsequently issued *Settler* a citation for violating regulations promulgated under the Magnuson-Stevens Act. See 50 C.F.R. § 648.14(a)(98) (1997). Two years later, NOAA issued Frontier Fishing a Notice of Violation and Assessment and a Notice of Permit Sanction.

## B. Frontier Fishing's Challenges to the Finding of Liability

During the seventeen years since the Coast Guard cited *Settler*, Frontier Fishing has consistently denied that *Settler* was actually in the restricted area. Central to Frontier Fishing's position is the radar contact recorded at 21:58 just inside the restricted area. That location is simply too far from the location that *Spencer*'s captain estimated observing *Settler* two minutes later, at 22:00 (approximately 1,000 yards from *Spencer*). Frontier Fishing built two arguments based on this discrepancy: it must have been another vessel that the Coast Guard was tracking by radar (the phantom vessel theory); or, in any event, any unreliability of the 21:58 readings rendered unreliable the other range and bearing readings, most crucially those used to plot the 21:40 contact upon which the citation rests.

The adjudication of Frontier Fishing's challenge based on these arguments worked its way through an administrative law judge, to the NOAA administrator, to the district court (which remanded for de novo review), Frontier Fishing Corp. v. Evans, 429 F. Supp. 2d 316, 335 (D. Mass. 2006), back through the same administrative law judge, to the administrator again, back for a de novo review by a different administrative law judge, to the administrator for a third time, and finally to the district court again, which this time affirmed NOAA's ultimate finding of liability.

In finding Frontier Fishing liable, NOAA rested largely on the fact that the evidence was clear that a vessel was in the restricted area at 21:40, and *Settler*, viewed in the direction of the radar sightings and eventually intercepted just outside the restricted area, was the only vessel that could have been the contact identified at 21:40. In reaching that finding, NOAA agreed with Frontier Fishing that the 21:58 contact could not have represented an accurate depiction of where *Settler* was located at that time. NOAA nevertheless rejected the hypothetical explanation for the 21:58 contact proffered by Frontier Fishing: that there was a second phantom vessel visible to radar but not by sight, and that *Settler* itself was invisible to radar although visible by sight. Instead, NOAA opted for the explanation that the 21:58 contact was *Settler*, albeit erroneously located. In so reasoning, NOAA noted that the 21:40 plot placed a vessel well inside the area, that the

parties agreed that "something" spotted by the radar was in the area at the time, that the Coast Guard crew visually observed a lighted vessel in the direction of the 21:40 contact, and that any suggestion that the Coast Guard somehow missed a second vessel throughout the entire sequence of events was simply not credible given *Spencer*'s radar capabilities and the observations of both the *Settler* and *Spencer* crews.

## II. Standard of Review

The Magnuson-Stevens Act incorporates the standard of review from the Administrative Procedure Act (APA), and thus we look for substantial evidence to support the agency's final decision. See 16 U.S.C. § 1858(b); 5 U.S.C. § 706(2); N. Wind, Inc. v. Daley, 200 F.3d 13, 17 (1st Cir. 1999). Under the substantial evidence test, "the agency's decision is presumed valid." N. Wind, 200 F.3d at 17. "'[I]t requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable factfinder.'" Penobscot Air Servs., Ltd. v. Fed. Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999) (quoting Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 377 (1998)). The agency's findings must be set aside when the record before the court "'clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence.'" Penobscot, 164 F.3d at 718

(quoting <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 490 (1951)).

Our review of the district court's decision is de novo, because the district court reviewed only the administrative record and thus was "in no better position to review the agency than the court of appeals." <u>Puerto Rico</u> v. <u>United States</u>, 490 F.3d 50, 61 (1st Cir. 2007) (internal quotations and citations omitted).

## III. Analysis

## A. Frontier Fishing's Procedural Complaints

Before addressing the substance of Frontier Fishing's arguments on the matter of *Settler*'s location, we address two procedural arguments preserved by Frontier Fishing and pressed on appeal.

### 1. Refusal to Supplement the Administrative Record

During discovery prior to the very first hearing, NOAA produced to Frontier Fishing a one-page document that consisted of a single handwritten entry on a form like the Coast Guard's radar tracking log form. Dated October 16, 1997, with a time entry of "10:19", the document listed a "track" of "8174", "remarks" of "*Settler* Pts" and navigation data that Frontier Fishing's expert claimed shows contact 8174 at 22:19 located well inside the restricted area and a long way off from where *Settler* was admittedly located post-intercept by *Spencer*. Due to the passage of

time, discovery shed no light on what exactly this document was, or who created it.

At the first hearing, in August 2001, Frontier Fishing did not offer this document into evidence. Subsequently, it sought to introduce it in its first appeal to the district court. The district court rejected the attempt to supplement the record before the court. Frontier Fishing, 429 F. Supp. 2d at 325. In remanding, however, the district court did not preclude "such further development of the record . . . as appears advisable to the ALJ." Id. at 335.

ALJ Devine denied Frontier Fishing's request to supplement the record compiled at the first hearing by adding Exhibit 15. The ALJ questioned the relevance of the document, noting that it was unsigned and was not annotated in standard form. Most significantly, the document could not have any relevance unless the time entry of "10:19" were construed as 10:19 p.m. (i.e., 22:19), which would suggest no one accustomed to use of military time on such documents wrote it. Finally, the ALJ observed that Frontier Fishing had a full and fair opportunity to offer the document at the original hearing, and did not do so.

In so ruling, the ALJ did not abuse the discretion left to him on remand. His observations regarding the questionable materiality and provenance of the document speak for themselves. Frontier Fishing fails, also, to offer any good cause for why it

did not offer the document at the first hearing, claiming only negligence by prior counsel (whom the ALJ found to have presented a vigorous defense).

## 2. Denial of Request for Additional Discovery

Frontier Fishing argues on appeal that the NOAA and the district court erred in denying requests for additional discovery. "We disturb a district court's management of discovery 'only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party.'" Olsen v. United States, 414 F.3d 144, 156 (1st Cir. 2005) (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 186 (1st Cir. 1989)). Generally, further discovery is not allowed in an action for judicial review upon an administrative record for the same reasons that supplementation is generally not permitted. Id. at 155-56. "It is almost inherent in the idea of reviewing agency or other administrative action for reasonableness; how could an administrator act unreasonably by ignoring information never presented to it?" Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003). As for NOAA's denial of additional discovery, the applicable agency rule gave the ALJ the discretion to "allow additional discovery only upon a showing of relevance, need, and reasonable scope of the evidence sought." 15 C.F.R. § 904.240(b). For the reasons stated by the ALJ and the district

court, we find that this is not one of those unusual cases in which a district court or an agency must allow additional discovery. Frontier Fishing (1) was given ample opportunity to conduct reasonable discovery throughout the various administrative proceedings; (2) was able to move for summary judgment without the information it now seeks through further discovery; and (3) received all of the information the agency used to make its determination. Frontier Fishing Corp., 429 F. Supp. 2d at 326.

## B. The Merits

We begin our analysis of the merits with several observations amply supported by the record. First, prior to 21:40, the cutter's crew spotted one set of lights in the general direction of the restricted area, prompting the taking of a plotted radar contact at 21:40. Second, Frontier Fishing, by conceding that the Coast Guard reliably plotted 'something' in the restricted gear area, agreed that the position of radar contact 8174 at 21:40 was .69 nautical miles inside the restricted gear area.[3] Third, there is no claim that the distance between that location and the location where *Spencer* intercepted *Settler* just outside the area was too far for *Settler* to travel between 21:40 and 22:08. Fourth, during the entire incident, no crew member of either vessel observed any other lights or vessels, nor did *Spencer*'s radar

---

[3] *Spencer*'s quartermaster placed it approximately 200 yards further inside the area.

-11-

detect two vessels at any point during the relevant events. Fourth, *Settler* could not have been in the location of the radar contact as recorded at 21:58 because that location was too far from the location at which Commander Diaz estimated *Settler* at 22:00, approximately 1,000 yards away from *Spencer*.

NOAA's take on the foregoing information was that radar contact 8174 was *Settler*, and that the 21:58 radar contact was erroneously recorded. The primary alternative explanation tendered by Frontier Fishing is that there was a phantom vessel that moved from the site of the 21:40 plot to the sites of the 21:47, 21:52, and 21:58 contacts, and then disappeared from the radar. This explanation presumes that *Settler* itself was invisible to the radar until after 21:58, while the phantom vessel by coincidence remained visible to the radar until after 21:58 but invisible to the eyes of those on both *Settler* and *Spencer* on an evening when visibility was eight miles.

NOAA, which plainly has much more expertise with such matters than do we, rejected this explanation as not credible. Substantial evidence supports this conclusion. *Spencer*'s radar was set to pick up vessels within twelve nautical miles. Frontier Fishing's claim that "radar clutter" from "high flyers" in the area may have blinded *Spencer*'s radar does not persuasively explain how *Spencer*'s radar would repeatedly detect one moving vessel and not the other over the course of a half hour. And the commanders of

both *Spencer* and *Settler* testified that they could tell the difference on radar between high flyers and a vessel.

Frontier Fishing claims that the Coast Guard never visually correlated radar target 8174 to the lighted vessel, and that *Spencer*'s steady approach to the lighted vessel was actually consistent with Frontier Fishing's claim that *Settler* maintained a straight, southerly trawl path outside the restricted area, and was not consistent with target 8174's radar plots. Frontier Fishing's expert testified that "the heading and maneuvering of [*Spencer*] was always directed at the trawler lights and at no time was [*Spencer*'s] maneuvering or heading directed toward any of the radar points purported to be [*Settler*]." Of course the alidade readings cut against this theory, so Frontier Fishing points to an absence of any written reference to those readings in some reports, as implying that the crew of *Spencer* actually took no such visual bearings.

NOAA considered Frontier Fishing's expert analysis on this point and rejected it. NOAA found that "there is no evidence of a continuous navigational track for [*Settler*]," as assumed by Frontier Fishing's expert. The ALJ noted that Frontier Fishing's expert relied on *Settler*'s manually inputted 21:30 waypoint position to support his analysis, and that no corroborating evidence supports Frontier Fishing's allegation that *Settler* actually began trawling at the manually inputted waypoint position.

Further, nothing in the record conclusively established that *Spencer*'s approach angles, cited by Frontier Fishing's expert, would be unreasonable for intercepting another vessel at high speed. Contrary to Frontier Fishing's claim, we also note multiple instances in the record that show the crew did correlate radar readings with its visual sightings using an alidade. For example, in the offense investigation report, Commander Diaz noted that he himself at one point "shot a bearing" of *Settler* using *Spencer*'s starboard alidade. He also testified that Coast Guard crew determined target 8174's location at 21:40 using "an alidade bearing, a radar range and [*Spencer*'s] electronic DGPS position." A quartermaster also testified to the use of an alidade that night. While not supported by all the evidence in the record-- acknowledging that several crew member reports do lack specific reference to alidade use--NOAA's conclusion that Coast Guard crew properly correlated the 21:40 radar reading and visual sightings was supported by substantial evidence, given the testimony by crew members at the hearings. The ALJ's decision to credit the testimony from Coast Guard crew on this point, and not Frontier Fishing's expert's analysis, based on uncorroborated assertions, constituted a reasonable resolution of the record.

Substantial evidence also amply supports the finding that the presumed location of the 21:58 radar contact was simply an error. The 21:58 reading was taken after the chase was on, as

-14-

*Spencer* traveled at high speed in the direction of *Settler*. The quartermaster recorded the reading by hand, based on information relayed to him verbally by other crew members. The measurement's baseline margin of error was as much as 200 yards, although that was not enough, even doubled, to account for the discrepancy between the 21:58 location and the 22:00 estimated position. The ALJ, however, cited as well the fact that, once the 21:40 plot was confirmed as a vessel within the restricted area, the crew would have devoted attention to the law enforcement and safety considerations manifest in the visually observed rapid pursuit of that vessel. And, in affirming the ALJ's decision, NOAA pointed to the fact that the 21:58 bearings were "taken when the vessels were closing in on each other at high speed." In short, the record supports the conclusion that human error provided an additional reason, beyond random error, to distinguish the 21:58 readings from the 21:40 plot. So, too, once one concludes that the convincing and reinforcing radar and visual evidence placed *Settler* at the 21:40 plot and that it was unbelievable that *Settler* remained invisible to radar while another visually invisible vessel was detectable by radar in a peek-a-boo manner, it follows, as Sherlock Holmes might observe, that the 21:58 location must have been wrong for the reasons suggested. And given the undisputed fact that the vessel detected at 21:40 was inside the area, it matters not that the 21:58 reading of that same vessel was itself erroneous.

We also recognize that Frontier Fishing, throughout its brief, makes a series of objections to NOAA's handling of this case. None of these objections leads inexorably to the conclusion that substantial evidence does not support the finding that *Settler* trawled illegally at 21:40. Frontier Fishing claims in essence that both ALJs and the Administrator all joined together with the Coast Guard in overzealous enforcement, in such a manner to render the NOAA's decisions unreliable. We have reviewed the record as a whole and find nothing that would support such a claim. The record here contained a complicated set of facts. That these extensive and complicated facts do not all neatly fit together does not thereby support a finding that NOAA proceeded in a manner that would allow its conclusions to be disregarded as biased. See <u>N.L.R.B.</u> v. <u>Hosp. San Pablo, Inc.</u>, 207 F.3d 67, 70 (1st Cir. 2000) (internal quotations and citation omitted)("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.")

In so concluding, we do not suggest that the case against Frontier Fishing was ironclad. The vessels' relative locations in relationship to the restricted area boundaries potentially rendered location by visual sighting insufficiently precise. And the point of interception was outside the area. Perhaps *Settler* was in the wrong (but legal) place at exactly the wrong time when unusual

radar conditions masked the visually obvious *Settler* even as the radar clearly and repeatedly detected an inexplicably unlit vessel moving nearby, but in the restricted area.  Just as the district court did, we hold only that, in rejecting this interpretation of the evidence, NOAA acted neither irrationally nor without minimally sufficient support in the record to conclude that *Settler* was the vessel plotted in the restricted area at 21:40.  In short, the record here does not "clearly preclude[] the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence." <u>Penobscot</u>, 164 F.3d at 718 (quoting <u>Universal Camera Corp.</u>, 340 U.S. at 490) (internal quotation marks omitted).

## IV. Conclusion

Substantial evidence supports NOAA's finding. Consequently, and for the reasons outlined above, we <u>affirm</u> the district court's decision upholding the NOAA Administrator's final decision.  <u>So ordered.</u>