James KENT, Thomas Wellwood, Roland Brokvist, and Robert Kahn, Plaintiffs,

v.

SunAMERICA LIFE INSURANCE COMPANY, Defendant.

No. Civ.A. 97–12317–REK.

United States District Court, D. Massachusetts.

Jan. 3, 2000.

Andrew A. Rainer, Shapiro, Grace & Haber, Boston, MA, Curtis C. Pfunder, Boston, MA, for plaintiffs.

Gregory P. Deschenes, Deborah L. Thaxter, John Pagliaro, Nixon Peabody, Boston, MA, for defendant.

## Opinion

KEETON, District Judge.

### I. Pending Motion

On April 30, 1999, Plaintiffs filed their second Motion for Class Certification (Docket No. 50) with supporting Memoranda and Affidavits (Docket No. 51, filed April 30, 1999, and Docket No. 56, filed May 20, 1999 (under seal)). Defendant filed its Opposition (Docket No. 62, filed August 25, 1999) with supporting Memoranda and Affidavits (Docket Nos. 63, 64, 69 (under seal), 72, 73 (under seal)). Plaintiffs filed a Reply Memorandum In Support of Motion to Certify Class on September 15, 1999 (Docket No. 70) and Defendant filed a Surreply Memorandum on September 21, 1999 (Docket No. 77) with supporting Affidavit (Docket No. 78).

For the reasons explained in this Opinion, I deny Plaintiffs' Motion for Class Certification.

### II. Procedural Background

Plaintiffs filed an eight-count complaint in this civil action over two years ago asserting the following causes of action: a violation of the federal Truth–in–Lending Act (TILA), 15 U.S.C. § 1601, common law fraud, negligent misrepresentation, unfair and deceptive trade practices, breach of duty of good faith and fair dealing, breach of contract, negligent supervision, and unjust enrichment.

On May 1, 1998, Plaintiffs moved to certify a class under their TILA claim.

On May 29, 1998, Defendant moved for partial summary judgment on plaintiffs' TILA claim, their only federal claim.

On June 16, 1999, I issued a Memorandum and Order denying defendant's motion for partial summary judgment and dismissing plaintiffs' motion for class certification. *See* Docket No. 41. My dismissal of Plaintiffs' Motion for Class Certification was based on my determination that the proposal then before me for a class definition was one that would cause interests not-in-common to predominate over interest in-common among members of the proposed class. In that Memorandum and Order, I made clear, however, that

> as the preparation for trial of individual claims proceeds, [the court may] consider again whether a class can be defined so as to enable the parties and the court to fashion orders regulating trial that would make possible an adjudication of issues in common or a defined class as to whom issues in common predominate over other issues.

*See id.* at 10.

Since June of 1998, the parties' filings with this court have been directed towards discovery disputes and plaintiffs' second motion to certify a class (Docket No. 30, filed April 30, 1999), this time under plaintiffs' common law claims of fraud and breach of contract.

During a motion hearing on September 22, 1999, plaintiffs highlighted their legal arguments, together with their evidentiary proffers, in their effort to show that plaintiffs' proposed class is administratively feasible and would satisfy the requirements of Federal Rule of Civil Procedure 23.

### III. Factual Background

#### A. The ISL Policies

In 1983, the defendant SunAmerica, then known as Sun Life Insurance Company of America, introduced a line of whole life insurance policies known as its "Interest Sensitive Life" ("ISL") line of policies. Of these ISL policies, some were allegedly sold with the promise that the annual premiums of the ISL policy would "vanish" in the future—*i.e.*, the policyholder would no longer have to pay into the policy but would still remain eligible for the death benefit—because the policy costs would be paid from the accumulated earnings of the premiums previously paid. In the parties' briefs, these policies are called "van-

ishing premium policies." Each of these policies is identifiable by a reference on the face of the policy to an option called an "alternative to premium payment option." *See, e.g.,* Docket No. 73, Ex. 11 at PL 00017.

In 1984, after a year in which plaintiffs allege that the ISL policies accounted for 63% of premiums placed in force, SunAmerica began planning a "new generation" of ISL products (the ISL 1000, 2000, and 3000 series) in an effort to make the ISL policies more profitable. At the foundation of plaintiffs' motion for class certification are their allegations that defendant built into the ISL 1000, 2000, and 3000 series certain contrary-to-fact assumptions that policyholders would be encouraged to believe, thus inducing policyholders to buy life insurance policies on the premise that their premiums would "vanish" at a certain date. In fact, the "vanishing premium" did not vanish in the 10–12 year time period as plaintiffs allegedly expected.

Plaintiffs allege that in order to induce prospective policyholders to buy a life insurance policy in the SunAmerica ISL 1000, 2000, or 3000 series, SunAmerica used a uniform set of policy illustrations that showed an overly-optimistic "vanish date" based on the following false actuarial assumptions:

(1) "a maintenance cost assumption [of $24] that [SunAmerica] knew was less than the company was spending to maintain current ordinary policies . . .";

(2) "a policy lapse rate that was lower than the company had already experienced on its first generation ISL product";

(3) "an interest crediting rate (the rate at which it would pay interest on accumulated policy values) of 11.5% that was not only higher than the 11% interest crediting rate for the ISL 2, but that was higher than the company's own returns on fixed maturity instruments (11.44%)."

Plaintiffs Memorandum of Law in Support of Class Certification, Docket No. 50 at 5 (quotations and citations to the record omitted).

I pause here to make three points.

*First.* Plaintiffs' distinctive phrasing describing the allegedly fraudulent behavior of SunAmerica is not phrasing commonly recognized and generally accepted in the courts or in the marketplace.

*Second.* Plaintiff's phrasing is ambiguous in significant respects. Its ambiguity makes it unsuitable for use in a class definition, because of the need for a class definition that is precise and easily understood.

*Third.* The third point concerns the irrelevance of the third of plaintiffs' asserted fraudulent assumptions listed above. A company's return on its "fixed maturity instruments" is controlled by the terms of those instruments. The very nature of the option offered under the vanishing premium policy is that it may be, and probably will be, different from that associated with "fixed maturity instruments." It is true, of course, that the extent of the difference will vary with the choice made by the policyholder in exercising the option. For this reason, the practical consequences for the policyholder will be much more difficult to understand than they are under a fixed maturity instrument.

The key question I must consider in this case is whether the plaintiffs have succeeded in showing a basis for a class action claim for frauds that might be committed in marketing a form of document that is more complex than "fixed maturity instruments."

Central to plaintiffs' allegations of fraud and breach of contract is their contention that the illustrations provided to prospective policyholders by sales agents were designed by SunAmerica senior management to induce members of the class to purchase life insurance policies on the fundamental misunderstanding that after payment of a certain number of premiums, the life insurance policy would be "fully paid-up" and no additional money would be due out of pocket, *i.e.,* their premiums would "vanish." Also central to plaintiffs' allegations of fraud and breach of contract is their contention that SunAmerica senior management provided to the sales agents the software that generated the policy illustrations allegedly used to sell vanishing premium life insurance policies, and that the allegedly fraudulent actuarial assumptions (1)–(3) listed above were embedded in the software. By alleging that SunAmerica senior management encouraged its sales agents

to use these illustrations and that SunAmerica senior management provided its sales agents with computers to produce immediately, on request, the illustrations for prospective policyholders, plaintiffs attempt to make a case for a "top-down conspiracy" at SunAmerica. Such a "top-down conspiracy," plaintiffs aver, provides the classic backdrop for a class-action lawsuit concerning consumer fraud.

## B. The Policy Illustrations

Plaintiffs allege that the core aspects of the "top-down" conspiracy are contained, in a uniform manner, within the policy illustrations that were used to sell the life insurance policies with the vanishing premium option. In particular, plaintiffs point to the interest rates quoted at the bottom of the illustration page and the parenthetical "current" next to the quoted rates as evidence of the fraudulent nature of the actuarial calculations. Modifying the statements of interest rates are several footnotes also at the bottom of the illustrations that say:

PROJECTED PREMIUMS AND VALUES ARE BASED ON SUN LIFE'S CURRENT RISK RATES AND THE FOLLOWING INTEREST RATES: YEAR 1: __% (GUARANTEED FOR 1 YEAR)

YEAR 2—END OF ILLUSTRATION: __% (CURRENT)

ACTUAL VALUES WILL VARY DEPENDING ON ACTUAL DECLARED INTEREST AND RISK RATES.

For examples of these illustrations, see Docket No. 73, Exhs. 21C and 21D; Plaintiffs' Exhibit A, entered into evidence during the Hearing of September 22, 1999; Defendant's Exhibit AA, entered into evidence during the Hearing of September 22, 1999.

Plaintiffs contend that the "current" interest rate quoted beside the parenthetical was not the "current" interest rate that SunAmerica was receiving on its investments. Specifically, plaintiffs contend that the interest rates quoted were higher than the rates SunAmerica was receiving and could reasonably expect to receive on its investments. Furthermore, plaintiffs assert that by quoting the interest rates in the manner they do, the

illustrations imply that the rate quoted at the time the policy is signed is guaranteed not to change significantly during the life of the policy and that, as a consequence, the premiums will "vanish" as promised.

Plaintiffs do not contest the following facts in the record before me about the circumstances of the sale and about the form of the illustrations themselves: the interest rates as quoted at the bottom of the illustrations were variables that the software permitted each sales agent to change according to the circumstances of the particular sale; sales agents ran various illustrations at different interest rates to compare for the prospective policyholder the difference the interest rates made in premium payments and vanishing points; illustrations could be run with up to three changes in interest rates over the course of the policy's projected life; SunAmerica did not require sales agents to use illustrations when promoting the ISL policies; the same software could produce two policy illustrations run at the same interest rate but one showing a vanishing premium at a certain year and the other showing a continuous pay of premiums throughout the life of the policy.

Despite the existence of these undisputed variables in the way the policies were sold and the form that the illustrations could take, plaintiffs contend that the policies purchased were sufficiently uniform and were sold in a sufficiently uniform manner to permit this case to proceed as a class action.

Defendant points to the above variations as support for its argument that individual questions of law and fact will predominate over any imaginable common questions that could organize a cognizable class. Defendant calls attention to, in addition to the facts above, specific details of the vanishing premium option. For example, the option to stop making premium payments could be exercised only "on or after the 5th Policy Anniversary" and only when certain conditions are first met, *e.g.*, the accumulated value less any indebtedness exceeds the projected net single premium for all future benefits. *See* Docket No. 73, Ex. 11 at PL 00020 (ISL Policy for Plaintiff Robert Kahn). Another

significant detail of the vanishing premium option is that the "vanished premium" will remain in effect for as long as it is available.... Once elected, this option could cease to be available 1) if the current interest rate is lower than that assumed in the calculation of the projected net single premium, or 2) if current Risk Rates are raised from those used in the calculation of the projected net single premium, or 3) if a Partial Withdrawal or policy loan is made.

*Id.*

## C. The Plaintiffs

All of the plaintiffs learned of SunAmerica's life insurance policies through their employer, the Landmark School. Plaintiffs' proposed class definition, however, contains no reference to employment at the Landmark School. One issue I consider later in this Opinion, in Part VIII, is whether the deficiencies of the proposed class definition could be cured by including in the class definition a reference to employment at the Landmark School.

The two persons charged with providing information about the policies purchased by plaintiffs were Mark Brislin, Landmark School's business manager, and Jack Tyburski, an insurance sales agent who proposed several different insurance packages, some of which were various SunAmerica ISL policies, both to Brislin alone and then to Landmark employees as a group during several meetings at the school.

Mark Brislin testified during his deposition that he received several sets of illustrations from Tyburski run at varying interest rates to show the variation in vanishing years. *See* Docket No. 73, Ex. 2 at 186–87 and *compare* Ex. 29 (20 illustrations run on March 6, 1986 at 10.25%) *with* Ex. 30 (20 illustrations run on March 13, 1986 at 8%). Brislin further testified that Tyburski never guaranteed a fixed interest rate during the life of the SunAmerica policies that he was selling. *See* Docket No. 73, Ex. 2 at 70–73. What Brislin testified to understanding from Tyburski's presentation is that given a worst-case scenario of an interest rate around 8%, the policies would "meet the time frame of being paid off in 10 to 12 years." Brislin also

explained his understanding of the dependent relationship between the interest rate and the vanishing premium date.

> Q: So there was an understanding then on your part that if the interest rates were to drop the vanishing year—there would be a change. Correct?
>
> A: But they would have to drop dramatically. In effect, he was guaranteeing me like a 10 to 12, and in order for it—the rates would have to change dramatically more than they had been historically to go outside that time frame.

*See* id. at 58.

Next I summarize the testimony of the named plaintiffs, who ask to be recognized as class representatives.

### 1. James Kent

James Kent testified during his deposition that during an informational meeting at the Landmark School with Tyburski and Brislin, he asked Tyburski "we'll own this [ISL 3000 whole life policy], we'll own the policy after 10 or 12 years then, give or take interest rates?" to which Tyburski answered "Yes." *Id.* at 129. Kent further testified that he remembers seeing a "chart" before he signed a policy contract, but that he doesn't remember if he was given that "chart" at the informational meeting. *Id.* at 145. He also testified that had Brislin shown him the 8% "worst case" illustration in 1986, he would not have bought the policy. *Id.* at 198.

### 2. Thomas Wellwood

Wellwood testified during his deposition that he did not understand until he "conferred with [his] attorney" that the time at which the policy would be fully paid depended on the interest rates. *See* Docket No. 73, Ex. 5 at 103. Wellwood testified that he still did not understand what "interest-sensitive rate" (the descriptive title of the ISL series) means. *See id.* Wellwood does testify, however, to having received an illustration during a group sales presentation by Tyburski, and "after the meeting, talking about, you know, looking at each illustration because each illustration was somewhat different."

*Id.* at 92. Like Kent, Wellwood states that had he seen the 8% illustration with a vanishing year occurring in policy year 20 (the illustration that Brislin testified he received from Tyburski as a comparison), he (Wellwood) "probably" would not have purchased the policy. *Id.* at 104.

### 3. Roland Brokvist

Roland Brokvist explained in his deposition testimony that he relied on Brislin to explain the terms of SunAmerica's ISL policies to him.

> [T]here's a lot of things I don't understand so I look up to others. And the people I trust help me out and I just take a gamble more or less, you know.... I looked at it like that if the guy I'm looking up to thinks it's a great policy and he feels I'm going to benefit from it, I was kind of leading going that way.

Docket No. 73, Ex. 6 at 62. Brokvist also testified that he discussed the policy with Tyburski only twice; Brislin was his main contact for questions and concerns regarding the policy. *Id.* at 75. Unlike Kent and Wellwood, Brokvist testified that he remembers both Brislin and Tyburski "guaranteeing" that the policy would be completely paid off in 12 years. His testimony is like that of Kent and Wellwood, however, in stating that he does not remember either Brislin or Tyburski guaranteeing the constancy of the "current" interest rates as declared on their signed policies. *Id.* at 74–75.

### 4. Robert Kahn

Unlike the other plaintiffs, Kahn received all of his information from Brislin. *See* Docket No. 73, Ex. 4 at 85–88. Kahn states, however, that Brislin was getting his information from Tyburski. *Id.* Also unlike the other plaintiffs, Kahn testifies that he did not receive any written materials until he purchased the policy, nor did he do any independent investigation of the SunAmerica policy outside of Brislin's advice and information. *Id.* at 94–96. He further testifies that although his understanding of the relationship between interest rates and the vanishing year at the time he purchased the policy was "foggy," he did have the expectation based on representations by Brislin that he "wouldn't have to pay the premium after ten years." *Id.* at 92. Kahn does not remember Mr. Brislin affirmatively telling him that the interest rates would stay the same, however. *Id.* Yet, like the other plaintiffs, Kahn states that he would have wanted to know at the time he bought the policy that a chance existed that he would have to pay premiums for "a lot longer ... more than 15 years, let's say." *Id.* at 93.

## IV. Standard of Decision

■ District courts have the authority and responsibility to exercise discretion in deciding whether to grant or deny class certification.. *See Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir.1985), *cert. denied* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). The principal reason for making the matter one for the exercise of discretion is that a district court is closer to and more familiar with the practical and factual problems of administering a lawsuit than a reviewing court can be. *See, e.g., Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1993) (quoting *Windham v. American Brands, Inc.,* 565 F.2d 59, 65 (4th Cir.1977) (en banc) *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978)).

■ The discretionary decision of the district court is, of course, subject to review and will be overturned on appeal if it is based on an error of law or for some other reason determined by the reviewing court to be an abuse of discretion.

■ In order to certify a class, a court must conduct a "rigorous analysis" of the prerequisites of Federal Rule of Civil Procedure 23. *See General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). This "rigorous analysis" focuses on whether the party seeking certification of the class has met its burden of satisfying the requisite elements of Federal Rule of Civil Procedure 23. *See, e.g., Makuc v. American Honda Motor Co.,* 835 F.2d 389, 394 (1st Cir.1987). And although the Supreme Court has stated that a court should not decide the merits of a case at the class certification stage, *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78,

94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), a motion to certify "generally involves considerations ... enmeshed in the factual and legal issues comprising [a] plaintiff's cause of action." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (quotations and citations omitted). This is particularly true with respect to questions of predominance and superiority that necessitate a "close look" at the difficulties likely to be encountered in the management of a class action. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

## V.  Federal Rule of Civil Procedure 23

Rule 23 was designed as

"an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions' of law applicable in the same manner to each member of the class."

*General Tel. Co. of the Southwest,* 457 U.S. at 155, 102 S.Ct. 2364 (citing *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)).

For the named plaintiffs to obtain class certification and participate in this "peculiarly appropriate" form of judicial administration, the court must find:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Federal Rule of Civil Procedure 23(a). If the prerequisites of subdivision 23(a) are satisfied, a court must make additional findings under 23(b) in order to make the determination that the lawsuit may properly be maintained as a class action.

In the present lawsuit, plaintiffs request certification under 23(b)(1)(A) or 23(b)(3). Those subdivisions are reproduced below in their entirety:

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or ...

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23.

## VI.  Plaintiffs' Proposed Class

Plaintiffs propose that this court certify as a class all persons or entities who:

1) make a claim that SunAmerica Life Insurance Co. ("SunAmerica") made high-level management decisions based on misleading or fraudulent actuarial assumptions and projections that were not disclosed to marketing employees and agents; and

2) having been presented with information based on the above actuarial assumptions and projections, purchased vanishing premium policies from SunAmerica between January 1, 1985 and June 30, 1989; and

3) can, as a result of such purchase, state a cognizable claim under common law fraud or breach of contract.

Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, Docket No. 51 at 1.

Plaintiffs deliberately model their proposed class definition after the class certified in *In re New England Mutual Life Insurance Company*, 183 F.R.D. 33, 37 (D.Mass. 1998) (Keeton, J.). *New England Mutual* is a case, like the present one, in which the plaintiffs allege deceptive and manipulative sales tactics designed to induce the purchase of vanishing premium life insurance policies. And like the facts of the present case, the alleged tactics of *New England Mutual* sales agents also include computerized materials intended to be shown to prospective policyholders. Plaintiffs draw numerous other parallels between *New England Mutual* and the present case in an attempt to persuade me that because class certification was appropriate in *New England Mutual*, it is appropriate here. *See* Docket No. 51 at 2–3.

■ In plaintiffs' zealous advocacy, however, they do not take appropriate account of important and dispositive differences between the facts of *New England Mutual* and the facts of the present case. Plaintiffs' proposed class definition and the class as certified in *New England Mutual* do not fit the particular circumstances of the sales of the SunAmerica's life insurance policies or the details of policies themselves as they are alleged by plaintiff in their evidentiary proffers that are before me. Among other things, these factual distinctions prevent the class, as plaintiffs define it, from being administratively feasible, a threshold requirement to a finding that the plaintiffs have met their burden of showing that a class action under Rule 23 is the most appropriate way to proceed with litigation in this case. *See* 7C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1760, at 581 (2nd ed.1972) (description of class must be sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member). The following Section VII identifies the reasons why plaintiffs proposed class cannot be certified.

## VII. Problems with Plaintiffs' Proposed Class

### A. Ascertainability

■ Before applying the two-part analysis required by Rule 23(a) and (b), the court must determine whether the scope of the class that plaintiffs seek to certify is appropriate, *i.e.*, whether it is administratively feasible. *See, e.g., Haywood v. Barnes*, 109 F.R.D. 568, 576 (E.D.N.C.1986) ("Prior to the consideration of the criteria set forth under Rule 23(a), the court must initially find that a precisely defined class exists ....") *citing Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir.1976).

Another way of stating this proposition is that without a cognizable class defined by stable and objective factors—without a demonstrable correspondence between the class definition and the requirements of proffered evidence to enable me to determine whether a particular individual belongs in the class—class certification is inappropriate because class membership is not ascertainable. This threshold inquiry is essential because a class must be unambiguously defined in order for a court to decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment. *See Crosby v. Social Security Administration of the United States*, 796 F.2d 576, 580 (1st Cir.1986) (stating that because the standard "within a reasonable time" makes it impossible for potential class members to ascertain whether they are part of the class before individualized fact-finding and litigation, the class fails to satisfy a basic requirement under Rule 23). *See also Davoll v. Webb*, 160 F.R.D. 142, 144 (D.Colo.1995) (stating that "the requirement that there be a class is not satisfied unless the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member"); *In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D.Mo.1985) (stating that a class must be composed of members who are readily identifiable and ascertainable and members who are readily identifiable and

ascertainable cannot be "an amorphous, vague or indeterminate" group); 3B JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.04[1], at 23–119 ("membership of the class must be capable of ascertainment under some objective standard") and ¶ 23.04[2], at 23–291 – 23–292 (defendant's "action or inaction must not be so varied and particularized in relation to the individual putative class members as to be valid as to some and invalid as to others") (2nd ed.1985).

Plaintiffs' proposed class is fatally flawed because of this problem of ascertainability. It turns out also, on further analysis, that the problem of ascertainability defeats plaintiffs' efforts to clear the hurdles of commonality, typicality, and predominance erected by subsections (a)(2), (a)(3) and (b)(3) of Rule 23. These matters are discussed below.

## B. Problems of Commonality, Typicality, and Predominance

In so far as plaintiffs base their argument for class certification on an alleged uniformity of representations made in the illustrations, that argument is not persuasive. The illustrations were produced by software that contained a feature that enabled sales agents to change critically important variables, including interest rates, in order to produce comparative samples for potential policyholders. The illustrations also contained disclaimers at their bottom margin as to the fixed or non-fixed nature of assumed rates (*e.g.*, the quoted interest rate was "GUARANTEED FOR 1 YEAR") *See, e.g.*, Plaintiffs' Exhibit A, entered into evidence during Hearing of September 22, 1999. Also, proffered evidence is insufficient to support a finding that the actuarial assumptions about lapse rates and the maintenance cost of $24 was unreasonable, let alone caused the "vanish date" to extend long past the anticipated 10–12 years.

Uniformity as to format of the illustrations generated by the software does not make an illustration or a set of illustrations misleading. Indeed, uniformity of format contributes positively to a reader's being able to understand the different consequences that will follow from different assumptions about rates.

■ Also, showing uniformity of format falls far short of showing that the sets of illustrations made available to one plaintiff were in content materially like those given to another potential class member. The deposition testimony of the four named plaintiffs presents the problem that no showing is made that whatever representations were made in illustrations given to one person were misleading in a way typical for a class of potential policyholders who all reasonably relied on the illustrations. Moreover, some named plaintiffs say they did not receive illustrations and others say they received but did not read them. And most state that they relied on oral representations from Brislin and Tyburski more than on the written illustrations. Even greater factual disparities in the evidence before the court would exist among potential class members if the court were considering proffered evidence for the purpose of deciding what oral representations were typical.

Also, in so far as plaintiffs may be basing their argument for class certification on the uniformity of the sales technique and not the illustrations themselves, *i.e.*, on the alleged common fact of an alleged oral representation that the premiums would vanish within 10–12 years, the named plaintiffs are not typical of a class of potential policyholders that reasonably relied on uniform oral misrepresentations made by someone for whose conduct SunAmerica is accountable. Most of the plaintiffs say they relied on Brislin's statements. Brislin admitted to receiving from Tyburski illustrations that demonstrated vanishing dates that could extend as far as 20 years into the future, not 10–12 years as some plaintiffs allege that Brislin orally represented to them. Furthermore, the circumstances to which each plaintiff testified concerning the oral face-to-face encounters about the benefits and drawbacks of the ISL policies varied considerably from Kent to Wellwood to Brokvist to Kahn. The detailed circumstances of each policyholder's story are critical to that policyholder's claim. Thus, no "typical" case is presented by these plaintiffs, and their separate claims present few common questions of law and fact. *See, e.g., Jackson v. Motel 6 Multipurpose, Inc.,*

130 F.3d 999, 1006 (11th Cir.1997) (common course of misconduct by defendant did not predominate where plaintiffs' claims ultimately depended on resolution of case-specific factual issues). *Cf. In re The Prudential Ins. Co. of America*, 962 F.Supp. 450, 513–15 (D.N.J.1997), aff'd, 148 F.3d 283, 315 (3rd Cir.1998) (role of oral misrepresentations in effecting common scheme of deception in vanishing premium case did not defeat predominance of common issues where evidence showed oral misrepresentations made by agents throughout the country were "virtually identical" because agents were trained uniformly and required to use uniform sales materials).

As plaintiffs propose to define the class, questions like the following would have to be answered by the court for each potential plaintiff before anyone could join the class as a member: "Did you receive an illustration? If so, before or after you purchased the policy?"; "What kind of illustration did you receive—continuous pay or vanishing premium?"; "Did oral representations influence your decision to purchase the policy?". Common questions regarding typical plaintiffs, let alone a finding of a predominance of common questions regarding typical plaintiffs, are thus hard to find in such a grab-bag of individualized factual findings. *See, e.g., In re Jackson National Life Insurance Company Premium Litigation*, 183 F.R.D. 217, 221 (W.D.Mich.1998) (stating that "determinations of whether and which illustrations were given to class members, and of the nature of oral representations made to them at the point of sale, elements of obvious and undeniable importance to all of plaintiffs' claims are matters requiring individualized fact development" and that "[t]his militates against a finding that the common questions of fact posed even by plaintiffs' narrowed core theory predominate").

## C. Applicability of Rule 23(b)(1)(A): The Threat of Inconsistent Adjudications?

■ Plaintiffs also request that I certify a class under 23(b)(1)(A).

Subsection 23(b)(1)(A) provides for certification of a class when "inconsistent or varying adjudications with respect to individual members of the class ... would establish incompatible standards of conduct for the party opposing the class." Fed.R.Civ.P. 23(b)(1)(A). In order to show that their claims are within this provision, plaintiffs must show some likelihood that a particular controversy will, indeed, generate separate adjudications that will require the defendant to take inconsistent actions. *See* WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1773.

The First Circuit has yet to develop a definitive framework within which to decide whether to certify a class under 23(b)(1)(A), but case law from other district and appellate courts applying Rule 23(b)(1)(A) is instructive. Courts have certified classes under 23(b)(1)(A) in cases in which a defendant might be forced to violate a judgment made in one court in order to satisfy a judgment imposed by another court. *See, e.g., McDonnell–Douglas Corp. v. U.S. Dist. Court for Central Dist. Of California*, 523 F.2d 1083 (9th Cir.1975); *In re Ford Motor Company Ignition Switch Products Liability Litigation*, 174 F.R.D. 332 (D.N.J.1997); *In re Agent Orange Product Liability Litigation*, 506 F.Supp. 762, 789 (E.D.N.Y.1980); *Sembach v. McMahon College, Inc.*, 86 F.R.D. 188 (S.D.Tex.1980).

■ Plaintiffs contend that if the action is not maintained as a class action, district courts likely will reach inconsistent or varying adjudications on a number of issues of law and fact common to all class members. *See* Docket No. 70 at 12 (Plaintiffs' Reply Memorandum in Support of their Motion for Class Certification) (stating that since plaintiffs seek imposition of a constructive trust restricting the proceeds of SunAmerica's ill-gotten funds, should other plaintiffs seek money judgments immediately returning those ill-gotten gains without regard to the maintenance of the insurance policies, defendant would be forced to violate the order of one court to satisfy the order of the other). As explained above, however, given the individual-fact-specific nature of the plaintiffs' claims, I perceive little risk of "inconsistent adjudications or incompatible standards of conduct in having those claims adjudicated separately." *Allison et al. v. Citgo Petrole-*

*um Corp.*, 151 F.3d 402, 421 & n. 16 (5th Cir.1998) (discussing the applicability of Federal Rule of Civil Procedure 23(b)(1)(A)). Furthermore, the relief requested by plaintiffs (a constructive trust) is essentially a request for money damages. And, thus in order to prevail on their motion to certify under 23(b)(1), plaintiffs would have to proffer sufficient evidence to demonstrate that defendant has insufficient funds to compensate the pool of potential plaintiffs. No such evidence has been proffered. Accordingly, I find that individual actions do not create a risk of inconsistent adjudications and that individual actions will not establish incompatible standards of conduct for the defendant. For these reasons, I find that plaintiffs have not satisfied the requirements of Rule 23(b)(1)(A). *See, e.g., McBirney v. Autrey*, 106 F.R.D. 240 (N.D.Tex.1985) (no risk of inconsistency exists where defendant is liable for damages to one plaintiff but not to another, since paying one claimant is not inconsistent with not paying another claimant).

## VIII.

Emerging from the Landmark School connections of the named plaintiffs who wish to be designated as class representatives, noted in Part III.C above, is an issue concerning whether adding to the class description a reference to the Landmark School connections might enable one or more of the plaintiffs to qualify as a representative of a more limited class of claimants having Landmark School connections. I conclude that any attempt to produce an administratively feasible class definition in this way would fail. The analysis of relationships between each of the plaintiffs with the other named plaintiffs, in Part VII above, demonstrates that their claims are so disparate that no precise and administratively feasible class definition would include their claims. The proposed limitation of the definition this way would leave us with a record failing to show the existence of a large enough number of qualifying claimants to warrant class action proceedings.

## ORDER

For the foregoing reasons, it is ORDERED:

Plaintiffs' Motion for Class Certification (Docket No. 50) is DENIED.